964 A.2d 855

HUNTLEY & HUNTLEY, INC.

v.

BOROUGH COUNCIL OF the BOROUGH OF OAKMONT and the Borough of Oakmont, J. Bryant Mullen, Michelle Mullen, Mitchell J. Patti, Christine M. Patti, Diane M. Hamilton, Leo P. Bidula and Maureen M. Bidula

Appeal of Borough Council of the Borough of Oakmont and the Borough of Oakmont.

Huntley & Huntley, Inc.

v.

Borough Council of the Borough of Oakmont and the Borough of Oakmont, J. Bryant Mullen, Michelle Mullen, Mitchell J. Patti, Christine M. Patti, Diane M. Hamilton, Leo P. Bidula and Maureen Bidula

Appeal of J. Bryant Mullen, Michelle Mullen, Mitchell J. Patti, Christine M. Patti, Diane M. Hamilton, Leo P. Bidula And Maureen M. Bidula.

Supreme Court of Pennsylvania.

Argued Sept. 9, 2008.

Decided Feb. 19, 2009.

Clifford B. Levine, Shawn N. Gallagher, Thorp Reed & Armstrong, L.L.P., Pittsburgh, for Borough Council of the Borough of Oakmont and the Borough of Oakmont.

Dennis A. Whitaker, Harrisburg, Susan P. Shinkman, Pittsburgh, PA Dept. of Environmental Protection, for Dept. of Environmental Protection, appellant amicus curiae.

Stanley J.A. Laskowski, Caldwell & Kearns, P.C., Harrisburg, for PA State Ass'n of Boroughs, appellant amicus curiae.

Thomas L. Wenger, David Russell Getz, Peter Grayson Howland, Wix, Wenger & Weidner, P.C., Harrisburg, for PA State Ass'n of Tp. Sup'rs, appellant amicus curiae.

Scott MacNair, Pittsburgh, Terry W. Clemons, Doylestown, Clemons Richter Walsh & Reiss, P.C., for Bucks County Ass'n of Tp. Officials, appellant amicus curiae.

Jordan Berson Yeager, Doylestown, Curtin & Heefner, L.L.P., Elizabeth Koniers Brown, Pittsburgh, for Nockamixon Tp., et al., appellant amici curiae.

Patricia L. Dodge, Meyer, Unkovic & Scott, L.L.P., Pittsburgh, for Huntley & Huntley, Inc., appellee.

Dwight David Fergurson, Hollinshead, Mendelson, Bresnahan & Nixon, P.C., Pittsburgh, for J. Bryant Mullen, et al.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## *OPINION*

Justice SAYLOR.

This appeal by allowance requires an examination of the preemptive scope of Pennsylvania's Oil and Gas Act. It also raises the separate question of whether the municipality should have granted a conditional use permit to drill a natural gas well on the residential property in question. This case and its companion, *Range Resources–Appalachia v. Salem Township*, 600 Pa. 231, 964 A.2d 869, 2009 WL 413748 (2009), present our first occasions to interpret the preemptive language contained in the act.

### I. Background

Appellee Huntley & Huntley, Inc. ("Huntley"), an engineering company involved in the oil and gas industry in Pennsylvania, sought to extract natural gas from two parcels of land located in the Borough of Oakmont, Allegheny County (the "Borough"). In particular, the company sought to drill and operate a natural gas well on residential property owned by Mr. and Mrs. Capretto. Huntley contemplated that the well would supply natural gas from that property, as well as an adjacent residential parcel owned by Mr. and Mrs. Massaro. Both parcels are located in an R–1 (single-family) residential

zoning district within the Borough, and comprise a total of approximately ten acres (hereinafter, the "Property").

On August 31, 2005, Huntley entered into commercial oil and gas lease agreements with both the Caprettos and the Massaros to allow it to conduct drilling and extraction of natural gas from the Property. The Pennsylvania Department of Environmental Protection (the "Department") issued a permit one week later, approving the drilling of the well at that location. Thereafter, the Borough solicitor sent a letter to Huntley on November 9, 2005, setting forth its position on the matter. The letter stated that the Borough solicitor, the Borough Council ("Council"), and the municipality's zoning officer were all in agreement that, under the proper interpretation of the Borough's zoning ordinance (the "Ordinance"), drilling for natural gas constituted the extraction of minerals, which is only permitted in an R–1 district as a conditional use. Thus, the solicitor directed Huntley to cease operations on the well and submit a conditional use application, which would ultimately be acted upon by Council after a hearing at which interested parties could be heard. Any approval, moreover, would be subject to such conditions as Council deemed appropriate.

In accordance with the above, Huntley perfected a conditional-use application and, on February 6, 2006, Council held a public hearing. At the hearing, Huntley's employees testified that the construction of the well would take about six weeks, would require approximately 30 trips of heavy equipment or trucks, and would be noisy. If completed according to plan, the operation would entail: a wellhead consisting of red and green pipes protruding approximately four feet above ground; a chain link fence around the wellhead with privacy screening and landscaping to conceal unsightliness; a 15,000 square foot "pad;" a 50–barrel fluid tank locatable anywhere on the property; a vent shaft protruding from the tank to vent some of the gas; pressure relief valves; a gravel access road from a nearby street to the well site; and a utility gas meter along another road bordered by a chain link fence. Following construction, the well would require regular servicing for six

months, including the evacuation of water from the fluid tank, which would involve a truck traveling through the neighborhood to the site. Huntley estimated that 75 percent of the gas extracted from the well would be sold to a public utility, with the remainder to be consumed by the Caprettos and Massaros.

Although the operation would be predominantly commercial—which ordinarily would not be permitted in the R–1 district—Huntley asserted that, consistent with the Borough solicitor's correspondence, the proposed use would constitute the extraction of minerals, and thus, it was allowed as a conditional use under the Borough's zoning code.[1] Alternatively, Huntley contended that the Borough was preempted from restricting the location of the operation by the Oil and Gas Act (the "Act").[2] Section 602 of the Act provides:

> Except with respect to ordinances adopted pursuant to the ... Municipalities Planning Code, and the ... Flood Plain Management Act, all local ordinances and enactments purporting to regulate oil and gas well operations regulated by this act are hereby superseded. *No ordinances or enactments adopted pursuant to the aforementioned acts shall contain provisions which impose conditions, requirements or limitations on the same features of oil and gas well operations regulated by this act or that accomplish the same purposes as set forth in this act.* The Commonwealth, by this enactment, hereby preempts *and supersedes* the regulation of oil and gas wells as herein defined.

58 P.S. § 601.602 (emphasis added to highlight language supplied by a 1992 legislative amendment). A separate provision of the Act places restrictions on the location of wells. *See* 58 P.S. § 601.205.

1. The zoning ordinance permits "extraction of minerals" as a conditional use in an R–1 residential district, and defines that term as "any use consisting of the mining and extraction of coal or other minerals." However, the ordinance does not define the terms "mining" or "mineral."

2. Act of December 19, 1984, P.L. 1140 (as amended, 58 P.S. §§ 601.101–601.605).

Two groups of individuals, most of whom lived near the Property, objected to Huntley's application. One group, represented by counsel, made several specific objections to the application, including that: Council lacked jurisdiction; only solid crystalline substances qualify as minerals and, hence, natural gas does not constitute a mineral; and the proposed use is a prohibited commercial use in an R–1 residential zone. The second group of objectors, not represented by counsel, protested that the use would have adverse safety, noise, and traffic effects on the community.

Council eventually concluded—contrary to the view reflected in the Borough's prior correspondence—that the proposed use did not fall within the zoning ordinance's definition of "extraction of minerals" so as to constitute a conditional use within an R–1 district. In reaching this determination, Council reasoned that extraction of natural gas does not constitute a mining process and that natural gas is not a mineral. Acknowledging that the zoning ordinance lacked any specific definition of "mineral," Council relied on its view that Pennsylvania common law has applied a rebuttable presumption in the context of private deed conveyances that the term "mineral" does not include oil or gas. *See* Council's Findings of Fact and Conclusions of Law at 8 (citing *Dunham & Short v. Kirkpatrick*, 101 Pa. 36 (1882), and *Highland v. Commonwealth*, 400 Pa. 261, 161 A.2d 390 (1960)). Additionally, Council stated that, because the extraction of natural gas is not a use specifically identified in the zoning ordinance, Council lacked jurisdiction to consider whether that use would qualify as a special exception, as such determinations rest within the exclusive power of the Borough's zoning hearing board.[3] Finally, Council held that the Oil and Gas Act did not preempt the Borough's power to restrict the location of gas drilling and wellheads. Accordingly, Council denied the conditional use application.

**3.** Under the MPC, local zoning ordinances may provide for special exceptions, to be administered by the zoning hearing board, as well as conditional uses, to be handled by the governing body. *See* 53 P.S. § 10603(c)(1, 2).

The common pleas court affirmed the decision of Council. The court agreed with Council's conclusions that gas drilling does not constitute the extraction of minerals for purposes of the Ordinance, and that the Act does not preempt local zoning regulations involving gas drilling and production. In the latter respect, the court relied on the Commonwealth Court's decision in *Nalbone v. Borough of Youngsville*, 104 Pa. Cmwlth. 623, 522 A.2d 1173 (1987), in which the court held that the Act permitted local regulation of oil and gas operations upon compliance with the Municipalities Planning Code ("MPC"). The common pleas court, moreover, agreed with Council that the proposed use could only be allowed in the Borough as a special exception; thus, the court affirmed Council's determination that the matter fell within the exclusive jurisdiction of the zoning hearing board. *See Huntley & Huntley v. Borough Council of Borough Oakmont*, No. SA06–000484 at 4 (C.P. Allegheny Dec. 6, 2006).

The Commonwealth Court reversed in a published decision. *See Huntley & Huntley v. Borough Council of Borough of Oakmont*, 929 A.2d 1252 (Pa.Cmwlth.2007) (*en banc*). The court initially agreed with Huntley's argument that the trial court's reliance on *Nalbone* was misplaced. The court explained that *Nalbone* had concluded that the Act, as it existed in 1987, preserved "local regulation of oil and gas well operations upon compliance with the provisions of the [MPC]." *Id.* at 1256 (quoting *Nalbone*, 104 Pa.Cmwlth. at 626, 522 A.2d at 1175). However, in 1992 the General Assembly amended Section 602 of the Act by adding the second sentence, which directs that municipal ordinances adopted pursuant to the MPC may not include provisions that "impose conditions, requirements or limitations on the same features of oil and gas operations regulated" by the Act. 58 P.S. § 601.602. The Commonwealth Court interpreted this language to mean that, to the extent the zoning ordinance in question (which was adopted by the Borough pursuant to the MPC) relates to features that the Act already addresses, it is invalid due to the Legislature's express preemption. *See Huntley*, 929 A.2d at 1256. Thus, the court found that the preemption question

distilled to whether the location of a gas well in a particular area of the Borough is a feature of gas well operations that the Act addresses. The court answered in the affirmative, noting that Section 205 of the Act imposes restrictions on gas well locations. *See* 58 P.S. § 601.205 (providing that oil and gas wells may not be drilled within certain distances of buildings, water wells, wetlands, and various types of bodies of water, and requiring the Department to consider a prospective well's impact on endangered species, as well as national and historical landmarks, when deciding whether to grant a drilling permit). According to the Commonwealth Court, by imposing further locational restrictions, the ordinance addressed the same topic and was, therefore, preempted with regard to any conditions on well placement, as applied to this case. *See Huntley*, 929 A.2d at 1256–57.[4]

As an alternate basis for reversing the common pleas court's decision, the Commonwealth Court disagreed with Council's interpretation of the zoning code as not permitting the extraction of natural gas as a conditional use on the grounds that there is no mining involved and natural gas is not a mineral. In this regard, the Commonwealth Court observed that the ordinance's enabling statute—the MPC—classifies natural gas as a mineral, *see* 53 P.S. § 10107, and that the dictionary defines mining to include mineral extraction. Thus, as the zoning ordinance expressly lists "extraction of minerals" as an allowable conditional use in an R–1 district, the court found that the ordinance permitted the creation of the proposed well as a conditional use, notwithstanding that the ordinance itself does not specifically define the terms "mining" or "mineral."[5]

4. The court employed the "as applied" qualifier because of its view that municipalities may enforce a local ordinance imposing conditions relating to such things as the slope and grading of wells. *See id.* at 1257 n. 5 (citing *Commonwealth v. Whiteford,* 884 A.2d 364 (Pa.Cmwlth.2005), *alloc. denied,* 588 Pa. 753, 902 A.2d 1243 (2006)).

5. In reaching this holding, the court addressed the Borough's assertion that Huntley's engineer had testified at the Council hearing that gas is not a mineral. Specifically, when one of the individual objectors asked, "And what's a mineral? Is that better for you? [sic]," the engineer responded, "The mineral is not oil or gas." N.T. February 6, 2006 at 73. While this exchange lacks clarity, the Commonwealth Court indi-

The court also rejected Appellants' argument based on *Boyd v. Zoning Hearing Bd. of Churchill Borough,* 83 Pa.Cmwlth. 110, 476 A.2d 499, 502 (1984), which held that a zoning ordinance's definition of "structure" could exclude a patio and, thus, deviate from the counterpart definition contained in the MPC. In distinguishing *Boyd,* the Commonwealth Court indicated that the definition of structure at issue in that case was consistent with that of the MPC because the MPC's definition did not expressly include patios. The court found that here, by contrast, the MPC specifically includes natural gas as part of its definition of mineral.

In light of the above, the court issued an order reversing the judgment of the trial court and remanding with instructions directing Council to issue the requested conditional use permit to Huntley. *See Huntley,* 929 A.2d at 1257–58. The court clarified, however, that its decision should not be understood to foreclose application of other provisions of the zoning ordinance "that do not address a feature of the Oil and Gas Act," and hence, Huntley may still be required to comply with other permitting requirements of the Borough. *Id.* at 1257.

The Borough of Oakmont and Borough Council, as well as several of the individual objectors (collectively, Appellants), petitioned this Court for allowance of appeal, questioning, first, whether the Oil and Gas Act precludes municipalities from exercising their zoning powers to regulate the location of oil and gas wells, and second, whether such municipalities must "use verbatim the definition of minerals employed in the MPC." *Huntley & Huntley v. Borough Council of Borough of Oakmont,* 597 Pa. 62, 950 A.2d 267 (2008) (*per curiam*). We granted allocatur primarily to address the preemption issue, and additionally allowed review of the definitional question because its resolution will determine the appropriate mandate if the disputed zoning restrictions are ultimately deemed permissible. Finally, we invited the Department to file an

cated that, in any event, the testimony had no bearing on the legal question of whether the MPC defines gas as a mineral, and whether that definition applies to the term as used in the Borough's zoning ordinance. *See Huntley,* 929 A.2d at 1257.

amicus brief addressing its understanding of the preemptive scope of the Act and its administrative regulations with regard to oil and gas well siting. *See id.*

## II. Oil and Gas Act Preemption

Appellants argue that the "very essence" of zoning is the designation of areas where different uses are permitted, subject to the appropriate level of municipal review. They state that, with the Oil and Gas Act, the Legislature distinguished the technical features of oil and gas operations, which the Act regulates and which the Department oversees statewide, from local zoning authority under the MPC, which the Act preserves. Thus, Appellants claim that the Commonwealth Court's decision was flawed in that it failed to recognize this "how-versus-where" distinction. In support of their contention, Appellants point to state-preemption provisions of other statutes—such as the Solid Waste Management Act, the Surface Mining Act, and the Non–Coal Act—that they maintain are similar to the preemption language in Section 602, and aver that a substantial body of decisional law from the Commonwealth Court interpreting such statutes has recognized that these provisions preempt local governance of operations, but leave local authority for site selection unencumbered. *See* Brief for Appellants at 23–25 (citing cases). Appellants emphasize their point in this regard by asserting that, even in the three areas of the law where the Legislature has preempted all local regulation, namely, alcoholic beverages, banking, and anthracite strip mining, *see Hydropress Envtl. Servs. v. Township of Upper Mt. Bethel,* 575 Pa. 479, 490, 836 A.2d 912, 918 (2003) (opinion announcing the judgment of the Court) (quoting *Council of Middletown Township v. Benham,* 514 Pa. 176, 182, 523 A.2d 311, 314 (1987)), municipalities retain the power to designate suitable districts for those uses. *See, e.g., Appeal of Sawdey,* 369 Pa. 19, 25, 85 A.2d 28, 31 (1951) (indicating, in *dicta,* that a zoning ordinance may exclude taverns from a residential area, albeit the regulation of liquor sales and distribution is preempted by state law).

As for the Commonwealth Court's determination that *Nalbone* could not be relied upon due to the 1992 amendment to Section 602, Appellants maintain that the court misconstrued the intent of that amendment. According to Appellants, the General Assembly's goal was merely to clarify, in the wake of certain judicial decisions, that the Commonwealth was preempting all local regulation of the operational facets of oil and gas enterprises, whether the ordinances in question were enacted before or after the effective date of the amendment. However, Appellants argue that the Legislature was not attempting to preempt zoning ordinances to the extent they designate appropriate districts in which oil and gas operations may be located. Rather, Appellants suggest that the setback and other requirements of Section 205, *see* 58 P.S. § 601.205, are only intended as a minimum level of protection for existing buildings, national landmarks, bodies of water, and other environmentally sensitive areas.

The Department articulates a position in substantial conformity with the above, developing that the technical aspects of well operations covered by the Act include such things as safety devices, the plugging of wells, well site restoration, and casing requirements aimed at protecting groundwater, *see* 58 P.S. §§ 601.206–601.210, and that these provisions are supplemented by the Department's regulatory framework found at 25 Pa.Code, Chapter 78, which addresses these topics as well as environmental-protection performance standards, temporary pits and tanks, storage of production fluids, disposal of drill cuttings and other residual waste, and bonding requirements. *See, e.g.*, 25 Pa.Code §§ 78.51–66, 78.71–111, 78.301–313. Thus, according to the Department, when the Legislature amended Section 602 of the Act to clarify that zoning ordinances enacted under the MPC may not "contain provisions which impose conditions, requirements or limitations on the same features of oil and gas well operations" regulated by the Act or "accomplish the same purposes" as the Act, it simply intended to foreclose municipalities from legislating on the technical aspects of well operations or enacting ordinances that purport to establish permitting, bonding, or registration

requirements for oil or gas wells. This, in the Department's view, does not equate to an evisceration of a political subdivision's "core municipal function" of designating different areas of the municipality for different uses. *See* 53 P.S. § 10105 (reflecting that the legislative purposes behind the MPC include allowing localities to promote the safety, health, and morals of the community, to accomplish coordinated development, and to guide uses of land and structures). *See generally Gary D. Reihart, Inc. v. Carroll Township,* 487 Pa. 461, 466, 409 A.2d 1167, 1170 (1979) ("The [MPC] is the Legislature's mandate for the unified regulation of land use and development.").

Huntley, on the other hand, indicates that the Commonwealth Court properly held that the Act preempts local zoning ordinances that attempt to regulate the location and operation of natural gas wells. In reaching this holding, Huntley argues, the court applied the plain language of the Act, which clearly regulates where natural gas wells may or may not be situated, thereby preempting local regulation of this feature. Huntley maintains that the cases cited by Appellants that interpret other state regulatory statutes are distinguishable because the preemption language at issue in those disputes either was not as explicit as that contained in Section 602 of the Act, or expressly allowed for supplemental local regulation.

Huntley also emphasizes that the Act limits a municipality's authority to enact zoning regulations that *either* impose conditions on the same features of oil and gas operations, *or* accomplish the same purposes as the Act. In this regard, Huntley notes that, even if this Court were to determine that the location of the well is not a "feature," we must still consider whether the challenged zoning restriction accomplishes "the same purposes as set forth in" the Act, 58 P.S. § 601.602, a topic that Huntley claims Appellants and the Department fail to address. Huntley proffers that the Act's purposes, which are carried out through the departmental permitting process, include allowing for the optimal development of the Commonwealth's oil and gas resources consistent

with the protection of the health, safety, environment, and property of its citizens, and protecting the property rights and safety of persons residing in areas where oil or gas exploration, development, storage, or production occurs. *See* 58 P.S. § 601.102; *see also id.,* § 601.205 (pertaining to well location restrictions). Finally, Huntley avers that, even if this Court were to conclude that the Act is ambiguous, its legislative history demonstrates that local regulation of the location of natural gas wells is preempted.

 Municipalities are creatures of the state and have no inherent powers of their own. Rather, they "possess only such powers of government as are expressly granted to them and as are necessary to carry the same into effect." *City of Phila. v. Schweiker,* 579 Pa. 591, 605, 858 A.2d 75, 84 (2004) (quoting *Appeal of Gagliardi,* 401 Pa. 141, 143, 163 A.2d 418, 419 (1960)). Even where the state has granted powers to act in a particular field, moreover, such powers do not exist if the Commonwealth preempts the field. *See United Tavern Owners of Phila. v. Philadelphia Sch. Dist.,* 441 Pa. 274, 279, 272 A.2d 868, 870 (1971). The preemption doctrine establishes a priority between potentially conflicting laws enacted by various levels of government. Under this doctrine, local legislation cannot permit what a state statute or regulation forbids or prohibit what state enactments allow. *See generally Liverpool Township v. Stephens,* 900 A.2d 1030, 1037 (Pa.Cmwlth. 2006) (quoting *Duff v. Northampton Township,* 110 Pa. Cmwlth. 277, 287, 532 A.2d 500, 504 (1987)). Additionally, a local ordinance may not stand as an obstacle to the execution of the full purposes and objectives of the Legislature.[6]

 Preemption of local laws may be implicit, as where the state regulatory scheme so completely occupies the field that it appears the General Assembly did not intend for

6. This precept, known as "conflict preemption," has traditionally been articulated to prohibit state laws from standing in the way of Congress's objectives, *see, e.g., Krentz v. Consolidated Rail Corp.,* 589 Pa. 576, 595, 910 A.2d 20, 32 (2006). It applies with equal force to municipal laws whose operation might otherwise conflict with the objectives of the state legislature. *See generally Burkholder v. Zoning Hearing Bd. of Richmond Township,* 902 A.2d 1006, 1012 n. 12 (Pa.Cmwlth.2006).

supplementation by local regulations.[7] It may also be express, as where the state enactment contains language specifically prohibiting local authority over the subject matter. As applied presently, Section 602 of the Oil and Gas Act contains express preemption language. That language totally preempts local regulation of oil and gas development except with regard to municipal ordinances adopted pursuant to the MPC as well as the Flood Plain Management Act. With regard to such ordinances, the express preemption command is not absolute. Accordingly, our interpretive task is to examine the particular wording of this provision, together with any other relevant aspect of the statute, in order to determine whether the Legislature intended to leave room for localities to designate certain zoning districts (such as residential ones) where oil and gas wells may be prohibited as a general matter. As this is a question of law, we exercise *de novo* review that is plenary in scope. *See Gregg v. V–J Auto Parts*, 596 Pa. 274, 284, 943 A.2d 216, 221 (2007).

Although, as noted, the preemption directive applicable to MPC-enabled ordinances is more limited than that pertaining to local enactments generally, it is nonetheless quite broad. Such ordinances are preempted to the extent that they either "contain provisions which impose conditions, requirements or limitations on the same features of oil and gas well operations regulated by" the Act, or "accomplish the same purposes as set forth in" the Act. As Huntley emphasizes, this edict reflects two independent proscriptive components, both of which must be given effect. *See* 1 Pa.C.S. § 1921(a). As to the former, the closely-contested question centers on whether

7. *See, e.g., Commonwealth v. Wilsbach Distributors, Inc.*, 513 Pa. 215, 519 A.2d 397 (1986); *Pittsburgh v. Allegheny Valley Bank*, 488 Pa. 544, 412 A.2d 1366 (1980); *see also Hydropress*, 575 Pa. at 494–95, 836 A.2d at 921–22 (Castille, J., concurring and dissenting); *cf. Harris–Walsh, Inc. v. Borough of Dickson City*, 420 Pa. 259, 268–69, 216 A.2d 329, 333–34 (1966) (recognizing a class of statutes that are silent as to supplementary local legislation and stating that, in these instances, the permissibility of municipal action is determined by evaluating whether the "general tenor" of the statute reflects "an intention on the part of the legislature that it should not be supplemented by municipal bodies[.]" (quoting *Western Pa. Restaurant Ass'n v. Pittsburgh*, 366 Pa. 374, 380–81, 77 A.2d 616, 619–20 (1951))).

the location of a well in a particular zoning district constitutes a feature of a natural gas well operation that is regulated by the Oil and Gas Act.[8] On this topic, although Huntley develops that the Act places some restrictions on the siting of wells-most notably, setback requirements designed to prevent damage to existing water wells, buildings and bodies of water, *see* 58 P.S. § 601.205(a, b), as well as measures intended to protect attributes of Pennsylvania's landscape such as parks, forests, gamelands, scenic rivers, natural landmarks, and historical and archeological sites, *see id.*, § 601.205(c)-it does not automatically follow that the placement of a natural gas well at a certain location is a feature of its operation.

The Statutory Construction Act of 1972 commands that words and phrases should ordinarily be understood according to their common and approved usage. *See* 1 Pa.C.S. § 1903(a).[9] "Feature" means a "prominent or conspicuous characteristic," RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 481 (2d ed. 2000), and "operation" refers to a process and manner of functioning, *see id.* at 929. Although one could reasonably argue that a well's placement at a certain location is one of its features in a general sense, it is not a feature of the well's operation because it is not a characteristic of the manner or process by which the well is created, functions, is

---

8. As discussed, Appellants contend that the intent underlying the 1992 amendment to Section 602 was simply to clarify that the provision's preemptive force is unrelated to whether the local law in question pre-existed the Act. This reasoning may apply to the phrase, "and supersedes," particularly in light of the discussion in *Miller & Son Paving v. Wrightstown Township*, 499 Pa. 80, 86–87, 451 A.2d 1002, 1005 (1982). It has little relevance, however, to the second sentence of Section 602, also added in 1992, which is primarily in view here. As the Commonwealth Court observed, *Nalbone*, which preceded the 1992 amendments, indicated that Section 602's first sentence expressed a legislative intention to preserve local oil and gas well regulation through MPC-enabled ordinances. *See Nalbone*, 104 Pa.Cmwlth. at 626, 522 A.2d at 1175. The permissibility of such local regulation was substantially curtailed by the 1992 addition of the second sentence to Section 602.

9. The exceptions to this rule for terms that are defined by the Statutory Construction Act itself or have acquired a "peculiar and appropriate meaning," *id.*, do not presently apply. *See, e.g.,* 1 Pa.C.S. § 1991 (pertaining to definitions).

maintained, ceases to function, or is ultimately destroyed or capped. Therefore, we find the resolution of this issue as advanced by Appellants and the Department to be persuasive and, accordingly, conclude that, absent further legislative guidance, Section 602's reference to "features of oil and gas well operations regulated by this act" pertains to technical aspects of well functioning and matters ancillary thereto (such as registration, bonding, and well site restoration), rather than the well's location. *Cf. Borough of Pottstown v. Pennsylvania Mun. Ret. Bd.*, 551 Pa. 605, 610, 712 A.2d 741, 743 (1998) (explaining that, where an administrative agency issues an interpretive rule construing a statute within its area of expertise, such a rule is viable so long as it tracks the meaning of the underlying statute).[10]

This leads to the second inquiry: whether the challenged zoning restrictions accomplish the same purposes as set forth in the Act. The "as set forth" qualifier signifies that this Court should not attempt to glean the Act's objectives from its substantive provisions, but instead should consult the list of purposes enumerated in the Act itself, namely, to:

(1) Permit the optimal development of the oil and gas resources of Pennsylvania consistent with the protection of the health, safety, environment and property of the citizens of the Commonwealth. (2) Protect the safety of personnel and facilities employed in the exploration, development, storage and production of natural gas or oil or the mining of coal. (3) Protect the safety and property rights of persons residing in areas where such exploration, development, storage or production occurs. (4) Protect the natural resources,

10. This is not to say that an ordinance would be enforceable to the extent it sought to increase specific setback requirements contained in the Act. *See, e.g., St. Croix, Ltd. v. Bath Township*, 118 Ohio App.3d 438, 693 N.E.2d 297 (1997) (holding that, where the state oil and gas statute prescribed a specific setback distance for oil wells relative to habitable structures, localities were precluded from increasing those distances through zoning). The issue here is distinct, however, as it pertains to the permissibility of a zoning-based preclusion of oil and gas wells in residential districts.

environmental rights and values secured by the Pennsylvania Constitution.

58 P.S. § 601.102.

By way of comparison, the purposes of zoning controls are both broader and narrower in scope. They are narrower because they ordinarily do not relate to matters of statewide concern, but pertain only to the specific attributes and developmental objectives of the locality in question. However, they are broader in terms of subject matter, as they deal with all potential land uses and generally incorporate an overall statement of community development objectives that is not limited solely to energy development. *See* 53 P.S. § 10606; *see also id.,* § 10603(b) (reflecting that, under the MPC zoning ordinances are permitted to restrict or regulate such things as the structures built upon land and watercourses and the density of the population in different areas). *See generally* Tammy Hinshaw & Jaqualin Peterson, 7 SUMM. PA. JUR.2D PROPERTY § 24:12 ("A zoning ordinance reflects a legislative judgment as to how land within a municipality should be utilized and where the lines of demarcation between the several use zones should be drawn."). More to the point, the intent underlying the Borough's ordinance in the present case includes serving police power objectives relating to the safety and welfare of its citizens, encouraging the most appropriate use of land throughout the borough, conserving the value of property, minimizing overcrowding and traffic congestion, and providing adequate open spaces. *See* Ordinance § 205–2(A).

There is some overlap between these goals and the purposes set forth in the Oil and Gas Act, most particularly in the area of protecting public health and safety. As we read the ordinance, however, the most salient objectives underlying restrictions on oil and gas drilling in residential districts appear to be those pertaining to preserving the character of residential neighborhoods, *see* Ordinance § 205–3(A)(7), and encouraging "beneficial and compatible land uses." *Id.,* § 305–3(A)(10). In this regard, the highest appellate court of one of our sister states has observed as follows:

While the governmental interests involved in oil and gas development and in land-use control at times may overlap, the core interests in these legitimate governmental functions are quite distinct. The state's interest in oil and gas development is centered primarily on the efficient production and utilization of the natural resources in the state. A county's interest in land-use control, in contrast, is one of orderly development and use of land in a manner consistent with local demographic and environmental concerns. Given the rather distinct nature of these interests, we reasonably may expect that any legislative intent to prohibit a county from exercising its land-use authority over those areas of the county in which oil development or operations are taking place or are contemplated would be clearly and unequivocally stated. We, however, find no such clear and unequivocal statement of legislative intent in the Oil and Gas Conservation Act.

*Board of County Comm'rs of La Plata County v. Bowen/Edwards Assocs., Inc.*, 830 P.2d 1045, 1057 (Colo.1992). We find the Colorado court's emphasis on a political subdivision's land-use authority appropriate here because, as discussed, the express preemptive language of Section 602 pertains to features of well operations and the Act's stated purposes. This limitation on preemption regarding MPC-enabled legislation appears to reflect the General Assembly's recognition, as Appellants contend, that, while effective oil and gas regulation in service of the Act's goals may require the knowledge and expertise of the appropriate state agency, the MPC's authorization of local zoning laws is provided in recognition of the unique expertise of municipal governing bodies to designate where different uses should be permitted in a manner that accounts for the community's development objectives, its character, and the "suitabilities and special nature of particular parts of the community." 53 P.S. § 10603(a), *quoted in* Brief for Appellants at 22. Accordingly, and again, absent further legislative guidance, we conclude that the Ordinance serves different purposes from those enumerated in the Oil and Gas

Act, and hence, that its overall restriction on oil and gas wells in R–1 districts is not preempted by that enactment.[11]

## III. Conditional Use

Having determined that the challenged portion of the zoning ordinance was not preempted by the Oil and Gas Act, we must now resolve whether the ordinance permits such drilling as a conditional use in an R–1 district. When Huntley applied for a conditional use permit, the Ordinance allowed the extraction of minerals as a conditional use in such a district, and defined that activity as "any use consisting of the mining and extraction of coal or other minerals." *See* Ordinance § 205–10 (relating to definitions). As may be expected, the parties are in sharp disagreement over the propriety of the Commonwealth Court's determination that Council should not have excluded natural gas drilling from the scope of such activities.

Appellants argue that the Commonwealth Court mistakenly superimposed the MPC's definition of mineral upon the relevant portion of the zoning code. They observe that the MPC's definitions generally attach to terms as they are "used in this act [the MPC]," 53 P.S. 10107(a), and reference *Boyd* for the position that local ordinances need not utilize the same definition of such words. Appellants also aver that the Ordinance makes reasonable provision for natural gas development, as required by the MPC, *see* 53 P.S. § 10603(i), because drilling is permitted as a special exception in other areas of the municipality besides R–1 residential districts. Additionally, Appellants point out that the Ordinance's definition of "extraction of minerals" includes the term mining and, on this basis, the Borough's construction of the activity to exclude drilling was reasonable.

11. Because of the potential for confusion, we again emphasize that our holding in this respect should not be understood to imply that any and all regulation of oil and gas development under the Ordinance would be permissible simply because it is zoning legislation enacted pursuant to the MPC. We do not, for instance, suggest that the municipality could permit drilling in a particular district but then make that permission subject to conditions addressed to features of well operations regulated by the Act.

Huntley responds by observing that, when it first applied for conditional-use approval, it did so upon the Borough's directive in which the Borough stated explicitly that it had considered the matter and determined that the drilling of a gas well fell within the zoning ordinance's definition of "extraction of minerals." Huntley states that the Commonwealth Court properly concluded that the Borough's *post-hoc* effort to redefine "mineral" to exclude natural gas was impermissible, particularly as it was entirely inconsistent with the MPC's definition of the same term. Further, Huntley maintains that *Boyd* is inapposite for the reason articulated by the Commonwealth Court, namely, that the ordinance in *Boyd* defined "structure" in a way that was consistent with the MPC's definition, and that the Commonwealth Court appropriately looked to the MPC in the present dispute to supply a default definition of "mineral" in the absence of one provided by the Ordinance. Finally, Huntley states that this Court has previously acknowledged that natural gas is a mineral.

As discussed, the Commonwealth Court developed that the Ordinance does not define "mineral," and determined that it should employ the definition of that term contained in the enabling statute. We find this approach to have been appropriate: while Appellants are correct in stating that the MPC's definitions are limited in application to their use in that statute, they overlook that the code's utilization of defined terms is always in relation to the requirements of local comprehensive plans and ordinances. *See* 53 P.S. §§ 10301, 10603. Thus, contrary to Appellants' portrayal, the MPC contemplates application of its definitions in the manner adopted by the Commonwealth Court. *Cf. Atlantic Richfield Co. v. Della Vecchia,* 69 Pa.Cmwlth. 235, 239, 450 A.2d 792, 794 (1982) (concluding that a local ordinance's express definition of "subdivision" was superseded by the MPC's definition of the same term because "the terms of the MPC take precedence over and invalidate, to the extent of their inconsistency, all local zoning enactments" (emphasis and internal quotation marks removed)). Therefore, the Commonwealth Court properly utilized the MPC's definition of the term

"mineral" to include natural gas, a usage that accords with this Court's understanding of the term. *See, e.g., United States Steel Corp. v. Hoge,* 503 Pa. 140, 146, 468 A.2d 1380, 1383 (1983) ("Gas is a mineral, though not commonly spoken of as such[.]"); *Kelly v. Keys,* 213 Pa. 295, 299, 62 A. 911, 913 (1906) (recognizing a distinction between minerals that are fugacious in nature, such as oil and gas, and those that have a fixed situs). This advances the MPC's policy directive that, where doubt exists as to the extent of a land-use restriction, local ordinances should be interpreted in favor of the property owner. *See* 53 P.S. § 10603.1.

The Borough maintains, however, that it is in the best position to determine what types of mining activities are best suited to each type of district, *see* Brief for Appellants at 37–38, and invokes the deference that courts ordinarily give to municipalities in interpreting their ordinances. *See Broussard v. Zoning Bd. of Adjustment of City of Pittsburgh,* 589 Pa. 71, 81, 907 A.2d 494, 500 (2006). As to the first of these points, the Borough's argument is not persuasive because it does not explain why drilling for fugacious minerals is less compatible with the common use of land in an R–1 district than is mining for coal or other solid substances, an arguably counterintuitive notion that would appear to require some justification.

Relative to the second point, we find the application of deference problematic in the present context for several reasons. For one, the principles that underlie the rule of deference are undermined where, as here, the municipality arrives at one interpretation of its ordinance—which it then conveys to the interested party as the basis for its command to apply for a conditional use permit—before adopting an alternate interpretation following the filing of the application and a hearing at which community members express their opposition to the project in question. In this regard, in the correspondence sent to Huntley in the pre-hearing timeframe, the Borough Solicitor specifically indicated that the pertinent Borough officials had considered the matter and determined that natural gas drilling was permitted as a conditional use. The letter stated, in relevant part:

Upon review of the Oakmont Zoning Code ... the Borough's recently-appointed zoning officer determined that the drilling [of] a gas well is within the definition of "extraction of minerals" set forth in Section 205–10 of the Code. Pursuant to Chart C of the Code, "extraction of minerals" is an activity which is permitted in R–1 Districts as a conditional use. ... The Borough Council and the Borough Solicitor support [the zoning officer's] determination with respect to this interpretation of the Code. ... If Huntley & Huntley had followed the Borough's direction at the outset to file a conditional use application, the conditional use hearing would be completed, the concerns of the citizens would be addressed and, possibly, the proposed use would have been approved.

Letter of Oakmont Borough Solicitor to Huntley & Huntley, dated November 9, 2005, at 1–2.[12]

Furthermore, we believe it would be unwise to defer automatically to a local governing body concerning the proper interpretation of a term that is expressly defined by the MPC and used in a zoning ordinance adopted pursuant to that statute, where the ordinance does not supply an alternate definition. Such an approach would invite litigation by fostering uncertainty as to the meaning of zoning terms, while opening the door for local agencies to adopt positions arbitrarily and/or based on interests unrelated to the legislative intent underlying the ordinance's enactment. Presently, Council's reversal of its earlier interpretation is the equivalent of a litigation position, as it was effected in the context of adjudicative proceedings undertaken with the virtual certainty that litigation would follow if the conditional use permit was denied. *See, e.g.,* N.T. Feb. 6, 2006, at 103 (reflecting testimony of Mr. Capretto that "[w]e are going to end up in court is what I'm saying because we are going to pursue this to the full degree"). *See generally Department of Educ. v. Empowerment Bd. of Control of Chester–Upland Sch. Dist.,* 595 Pa. 426,

12. Although the letter indicated that approval "possibly" would be granted upon completion of the application process, the suggestion that the permit might be denied was not predicated on a potentially restrictive definition of extraction of minerals.

450, 938 A.2d 1000, 1014 (2007) (Baer, J., concurring) (proffering that administrative interpretations forwarded for the first time in connection with adversarial litigation should not be given special weight).[13]

Accordingly, we hold that the Commonwealth Court's resolution of the issue was reasonable, and that Council improperly denied conditional use approval predicated on its after-the-fact, restrictive interpretation of the phrase, "extraction of minerals."

## IV. Conclusion

For the reasons stated, the judgment of the Commonwealth Court is reversed insofar as it held that the Oil and Gas Act preempts the zoning ordinance in question, but it is affirmed in all other respects. The matter will be remanded for further proceedings consistent with this Opinion.

Chief Justice CASTILLE, and Justices EAKIN, BAER, TODD, McCAFFERY and Justice GREENSPAN join the opinion.

---

13. Nor is it readily apparent, as the Borough appears to assume, that drilling is not a form of mining. Although drilling for fugacious minerals and mining for solid ones may involve different technical procedures, mining, as the Commonwealth Court noted, is defined with reference to excavating the earth to extract minerals, *see Huntley*, 929 A.2d at 1257; RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 844 (2d ed. 2000), a process that includes drilling. *See generally id.* at 459 (reflecting that "excavate" signifies making a hole in the earth by removing material). Thus, the Borough's argument that removal of solid materials is the only type of mineral extraction allowed in an R-1 district due to the use of the word "mining" remains unsupportable, as it rests on a definition of that word that does not appear in the Ordinance and is overly narrow.