THE STATE EX REL. MORRISON, LAW DIR.; THE CITY OF MUNROE FALLS, APPELLANT, *v.* BECK ENERGY CORPORATION ET AL., APPELLEES.

[Cite as *State ex rel. Morrison v. Beck Energy Corp.*, 143 Ohio St.3d 271, 2015-Ohio-485.]

(No. 2013–0465—Submitted February 26, 2014—Decided February 17, 2015.)

FRENCH, J.

{¶ 1} R.C. Chapter 1509 regulates oil and gas wells and production operations in Ohio. While it preserves certain powers for local governments, it gives state government "sole and exclusive authority" to regulate the permitting, location, and spacing of oil and gas wells and production operations within the state. R.C. 1509.02. In this case, we decide whether the Home Rule Amendment to the Ohio Constitution grants to the city of Munroe Falls the power to enforce its own permitting scheme atop the state system. We hold that it does not.

## Background

{¶ 2} In 2011, appellee, Beck Energy Corporation, obtained a permit from a division of the Ohio Department of Natural Resources ("ODNR") for the purpose of drilling an oil and gas well on property within the corporate limits of appellant, the city of Munroe Falls. This appeal arises from the city's attempt to stop Beck Energy from drilling based on its own municipal ordinances.

### R.C. Chapter 1509

{¶ 3} Beck Energy obtained its state permit through R.C. Chapter 1509. In 2004, the General Assembly amended that chapter to provide "uniform statewide regulation" of oil and gas production within Ohio and to repeal "all provisions of law that granted or alluded to the authority of local governments to adopt concurrent requirements with the state." Legislative Service Commission Bill Analysis, Sub.H.B. No. 278 (2004); R.C. 1509.02, Sub.H.B. No. 278, 150 Ohio Laws, Part III, 4157.

{¶ 4} In its current form, R.C. 1509.02 centralizes regulatory authority in state government, entrusting a division of ODNR with "sole and exclusive authority to regulate the permitting, location, and spacing of oil and gas wells and production operations" within Ohio (excepting certain activities regulated by federal laws). R.C. 1509.02 preserves the regulatory powers granted to local governments by R.C. 723.01 and 4513.34. R.C. 723.01 grants municipal corporations "special power" to control public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts, and viaducts. R.C. 4513.34 grants local authorities the power to grant permits to operate certain heavy vehicles on highways within their jurisdiction. But R.C. 1509.02 expressly prohibits a local government from exercising those powers "in a manner that discriminates against, unfairly im-

pedes, or obstructs oil and gas activities and operations regulated under [R.C. Chapter 1509]."

{¶ 5} A state permit is essential for any person seeking to drill a new well, drill an existing well deeper, reopen a well, convert a well to any use other than its original purpose, or plug back a well to a source of supply different from the existing pool. R.C. 1509.05. An applicant may obtain a permit through the procedures outlined in R.C. 1509.06, and the division chief must promulgate standards for obtaining a permit, including standards that address the safety of well drilling and operation, protection of the public and private water supply, fencing and screening of surface facilities, waste containment and disposal, construction of access roads, and noise mitigation. R.C. 1509.03(A); *see also* Ohio Adm.Code Chapter 1501:9–1. The regulations also establish well spacing and setback requirements based on the depth of the well and the well's proximity to other wells and private dwellings. *See* Ohio Adm.Code 1501:9–1–04(C) and 1501:9–1–05.

{¶ 6} In this case, Beck Energy's state permit contained a total of 67 conditions. The first 38 related to the site's designation as a "Municipal Wellhead Protection Area" and addressed issues including site preparation, pit construction, and waste disposal. The remaining 29 conditions governed "Urbanized Areas" and included site-specific restrictions relating to issues such as tree trimming, erosion control, noise mitigation, and parking. *See* R.C. 1509.01(Y) (defining "urbanized area"). To obtain a permit to drill a new well in an urbanized area, an applicant must provide a sworn statement that it has provided notice to the owner of each parcel of real property located within 500 feet of the surface location of the well, as well as to the "executive authority of the municipal corporation" in which the well is to be located. R.C. 1509.06(A)(9).

### The Ordinances

{¶ 7} Soon after Beck Energy began drilling, the city issued a stop-work order and filed a complaint seeking injunctive relief in the Summit County Court of Common Pleas. The complaint alleged that Beck Energy was violating multiple provisions of the Munroe Falls Codified Ordinances. This appeal concerns five of those ordinances, which the city passed between 1980 and 1995.

{¶ 8} The first is a general zoning ordinance in Chapter 1163 that prohibits any construction or excavation without a "zoning certificate" issued by the zoning inspector. Munroe Falls Codified Ordinances 1163.02(a). To obtain the zoning certificate, the applicant must obtain various approvals from the planning commission, the city council, the zoning inspector, and when a variance is being requested, the board of zoning appeals. Munroe Falls Codified Ordinances 1163.02(a)(1) through (4). For example, an applicant seeking approval of a conditional use must obtain a "conditional zoning certificate" by following the

procedures in section 1163.04, which include notice and a public hearing. Munroe Falls Codified Ordinances 1163.02(a)(3); *see also* section 1163.04. The conditional zoning certificate includes any "conditions, stipulations, and safeguards that have been approved by the Planning Commission and Council." Munroe Falls Codified Ordinances 1163.02(a)(3).

{¶ 9} The remaining four ordinances are in Chapter 1329, which specifically relates to oil and gas drilling. Munroe Falls Codified Ordinances 1329.03 prohibits any person from drilling a well for oil, gas, or other hydrocarbons "until such time as such persons have wholly complied with all provisions of this chapter and a conditional zoning certificate has been granted by Council to such person for a period of one year." Munroe Falls Codified Ordinances 1329.04 and 1329.06 require an applicant to pay a fee of $800 and deposit $2,000 for a performance bond at the time of filing. Finally, Munroe Falls Codified Ordinances 1329.05 requires a public hearing at least three weeks prior to drilling and requires the permit applicant to schedule the hearing and notify all property owners and residents within 1,000 feet of the well head.

{¶ 10} A person who violates any of the ordinances in Chapter 1329 of the Munroe Falls Codified Ordinances is guilty of a first-degree misdemeanor and "shall be imprisoned for a period not to exceed six months, or fined not more than one thousand dollars ($1,000), or both." Munroe Falls Codified Ordinances 1329.99. Each day of a violation constitutes a separate offense. *Id.*

### The Injunction

{¶ 11} In opposing the city's request for injunctive relief, Beck Energy argued that the city's ordinances conflicted with the statewide regulatory scheme in R.C. Chapter 1509. The trial court disagreed and granted the city's request for a permanent injunction prohibiting Beck Energy from drilling until it complies with all local ordinances.

{¶ 12} The court of appeals reversed, holding that R.C. 1509.02 prohibited the city from enforcing the five ordinances. 9th Dist. Summit No. 25953, 2013-Ohio-356, 989 N.E.2d 85. The court of appeals rejected the city's argument that the Home Rule Amendment allowed it to impose its own permit requirements on oil and gas drilling operations. *Id.* at ¶ 74.

{¶ 13} We accepted jurisdiction over the city's appeal.

### Analysis

{¶ 14} The question here is whether the city's ordinances represent a valid exercise of its home-rule power. Under the Home Rule Amendment to the Ohio Constitution, "[m]unicipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police,

sanitary and other similar regulations, as are not in conflict with general laws." Article XVIII, Section 3. This amendment gives municipalities the "broadest possible powers of self-government in connection with all matters which are strictly local and do not impinge upon matters which are of a state-wide nature or interest." *State ex rel. Hackley v. Edmonds,* 150 Ohio St. 203, 212, 80 N.E.2d 769 (1948).

{¶ 15} The Home Rule Amendment does not, however, allow municipalities to exercise their police powers in a manner that "conflict[s] with general laws." Article XVIII, Section 3; *see also State ex rel. Mill Creek Metro. Park Dist. Bd. of Commrs. v. Tablack,* 86 Ohio St.3d 293, 296, 714 N.E.2d 917 (1999). Therefore, a municipal ordinance must yield to a state statute if (1) the ordinance is an exercise of the police power, rather than of local self-government, (2) the statute is a general law, and (3) the ordinance is in conflict with the statute. *Mendenhall v. Akron,* 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 17.

{¶ 16} Under this three-step analysis, we conclude that the city's ordinances must yield to R.C. 1509.02.

### The Ordinances Constitute an Exercise of the Police Power

{¶ 17} The city does not dispute that its ordinances constitute an exercise of police power rather than local self-government. Our precedent is clear on this point. "[A]ny municipal ordinance, which prohibits the doing of something without a municipal license to do it, is a police regulation" within the meaning of the Home Rule Amendment. *Auxter v. Toledo,* 173 Ohio St. 444, 446, 183 N.E.2d 920 (1962); *see also Rispo Realty & Dev. Co. v. Parma,* 55 Ohio St.3d 101, 103, 564 N.E.2d 425 (1990) ("Ohio law has long recognized that the enactment of zoning laws by a municipality is an exercise of its police power * * * ").

{¶ 18} Here, the city's ordinances do not regulate the form and structure of local government. Instead, they prohibit—even criminalize—the act of drilling for oil and gas without a municipal permit. Therefore, we agree that the ordinances represent an exercise of police power rather than local self-government. Now, we must turn to the question of whether R.C. 1509.02 is a general law.

### R.C. 1509.02 Is a General Law

{¶ 19} A statute qualifies as a general law if it satisfies four conditions. It must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to prescribe those regulations, and (4) prescribe a rule of conduct upon citizens generally. *Menden-*

*hall,* 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, at ¶ 20; *Canton v. State,* 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, syllabus.

{¶ 20} The city disputes only the second of these conditions, arguing that R.C. 1509.02 does not apply to all parts of the state alike and does not operate uniformly throughout the state. According to the city, the statute fails the uniformity requirement because only the eastern part of Ohio has economically viable quantities of gas and oil. This argument is unpersuasive.

{¶ 21} Even if we were to accept the city's factual premise that drilling for oil and gas cannot occur in Ohio's western counties, this does not prevent R.C. 1509.02 from operating uniformly throughout the state. The uniformity require-ment comes from Article II, Section 26 of the Ohio Constitution, which states that "[a]ll laws, of a general nature, shall have a uniform operation throughout the State." The purpose of this provision is not "to render invalid every law which does not operate upon all persons, property or political subdivisions within the state," *State ex rel. Stanton v. Powell,* 109 Ohio St. 383, 385, 142 N.E. 401 (1924), but simply to ensure that a general law operates uniformly with respect to every person and locality to which it relates. *Id.*; *Beachwood v. Cuyahoga Cty. Bd. of Elections,* 167 Ohio St. 369, 372, 148 N.E.2d 921 (1958). We have recognized that a general law can operate uniformly throughout the state "even if the result * * * is that the statute does not operate in all geographic areas within the state." *Clermont Environmental Reclamation Co. v. Wiederhold,* 2 Ohio St.3d 44, 49, 442 N.E.2d 1278 (1982); *see also E. Liverpool v. Columbiana Cty. Budget Comm.,* 114 Ohio St.3d 133, 2007-Ohio-3759, 870 N.E.2d 705, ¶ 15 (stating that a law does not lack uniformity simply because it has a "disparate geographic effect").

{¶ 22} The city's argument is similar to the one we rejected in *Clermont.* There, we considered a statute that regulated hazardous-waste facilities and prohibited any political subdivisions from imposing additional regulations. *Id.* at 44, 49–50. While recognizing that such facilities might not be environmentally feasible in "some areas of the state," we concluded that the law operated uniformly throughout the state because its terms applied to all political subdivi-sions equally and did not create any classifications or exemptions favoring some over others. *Id.* at 50.

{¶ 23} We reach the same conclusion here. Whether or not every acre of Ohio constitutes viable drilling land, R.C. 1509.02 imposes the same obligations and grants the same privileges to anyone seeking to engage in oil and gas drilling and production operations within the state. Moreover, the statute applies to all municipalities in the same fashion, *see Ohioans for Concealed Carry, Inc. v. Clyde,* 120 Ohio St.3d 96, 2008-Ohio-4605, 896 N.E.2d 967, ¶ 45, by prohibiting all local governments from interfering in the regulation of any oil and gas activities

covered by R.C. Chapter 1509. R.C. 1509.02. Accordingly, we agree that R.C. 1509.02 constitutes a general law for purposes of our analysis.

*The Ordinances Conflict with R.C. 1509.02*

{¶ 24} Having found that the ordinances constitute an exercise of police power and that the statute is a general law, we must determine whether the ordinances and the statute conflict. A conflict exists if "the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." *Struthers v. Sokol,* 108 Ohio St. 263, 140 N.E. 519 (1923), paragraph two of the syllabus; *see also Ohioans for Concealed Carry* at ¶ 26.

{¶ 25} The city's ordinances conflict with R.C. 1509.02 in two ways. First, they prohibit what R.C. 1509.02 allows: state-licensed oil and gas production within Munroe Falls. Beck Energy's state permit expressly "granted permission" to "Drill [a] New Well" for "Oil & Gas" within Munroe Falls. But the city ordinances would render the permit meaningless unless Beck Energy also satisfied the permitting requirements in Chapters 1163 and 1329 of the Munroe Falls Ordinances. Section 1163.02(a) prohibited Beck Energy from building any structure or beginning "any excavation" until it followed all of the procedures necessary to obtain a zoning certificate. Munroe Falls Codified Ordinances 1163.02(a) and (b). Even if Beck Energy were to satisfy the conditions of Chapter 1163 without violating the 67 conditions of its state permit, Beck Energy still could not "drill a well for oil, gas, or other hydrocarbons" until it "wholly complied with all provisions" in Chapter 1329. Munroe Falls Codified Ordinances 1329.03(a). To comply with these provisions, Beck Energy would need to (1) wait one year after the city council approved the conditional zoning certificate, 1329.03(a), (2) pay a nonrefundable $800 application fee, 1329.04, (3) deposit a $2,000 "performance bond," 1329.06, and (4) schedule a public meeting at least three weeks prior to drilling, 1329.05(a).

{¶ 26} This is a classic licensing conflict under our home-rule precedent. We have consistently held that a municipal-licensing ordinance conflicts with a state-licensing scheme if the "local ordinance restricts an activity which a state license permits." *Ohio Assn. of Private Detective Agencies, Inc. v. N. Olmsted,* 65 Ohio St.3d 242, 245, 602 N.E.2d 1147 (1992); *Auxter,* 173 Ohio St. at 447, 183 N.E.2d 920; *Anderson v. Brown,* 13 Ohio St.2d 53, 58, 233 N.E.2d 584 (1968); *see also Am. Fin. Servs..Assn. v. Cleveland,* 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, ¶ 46 (stating that "any local ordinances that seek to prohibit conduct that the state has authorized are in conflict with the state statutes").

{¶ 27} In *Auxter,* for instance, the plaintiff obtained a state license to sell beer and wine, but the city ordinance prohibited such sales without a municipal license. Recognizing a conflict, we determined that "the *ordinance forbids and prohibits what the statute permits and licenses,*" because "[e]ven though plaintiff has a

state license authorizing him to carry on the business of selling beer in Toledo, the ordinance prohibits him from doing so if he does not pay for and secure a municipal license to do so." (Emphasis sic.) *Id.* at 447. Likewise, in *Anderson,* we concluded that any municipal ordinance that prohibits the operation of a mobile-home park without a municipal license is in conflict with a statute that gave state-license holders the right to operate those parks. *Id.* at 58. We have found a conflict to exist between a statewide regulatory scheme governing construction and demolition debris facilities and a general zoning ordinance that prohibits such facilities, *Sheffield v. Rowland,* 87 Ohio St.3d 9, 12, 716 N.E.2d 1121 (1999), between an ordinance that requires a licensing fee for private investigators and a "statewide regulatory program" that specifically prohibits the imposition of municipal fees, *Ohio Assn. of Private Detective Agencies* at 245, and between a statute regulating the permitting of concealed handguns and a municipal ordinance prohibiting handguns in a public park, *Ohioans for Concealed Carry, Inc. v. Clyde,* 120 Ohio St.3d 96, 2008-Ohio-4605, 896 N.E.2d 967, ¶ 53.

{¶ 28} Beneath this weight of authority, the city argues that there is no conflict, because the statute and the ordinances "regulate two different things." It explains: the ordinances address "traditional concerns of zoning," whereas R.C. 1509.02 relates to "technical safety and correlative rights topics." This distinction is fanciful, and it ignores the plain text of the ordinances as well as the statute. The ordinances and R.C. 1509.02 unambiguously regulate the same subject matter—oil and gas drilling—and they conflict in doing so. Under the city's ordinances, a state permit holder cannot begin "any excavation" or "drill a well for oil, gas, or other hydrocarbons" without fully complying with local provisions. Munroe Falls Codified Ordinances 1163.02(a) and 1329.03(a). And state law prohibits any person—including a municipal permit holder—from drilling for oil or gas "without having a permit to do so issued by the chief of the division oil and gas resources management." R.C. 1509.05. This case is indistinguishable from our long line of conflict precedent. *See Auxter,* 173 Ohio St. at 447, 183 N.E.2d 920; *Anderson,* 13 Ohio St.2d at 58, 233 N.E.2d 584; *Am. Fin. Servs. Assn.* at ¶ 46; *Neil House Hotel Co. v. Columbus,* 144 Ohio St. 248, 58 N.E.2d 665 (1944), paragraph three of the syllabus. Because Beck Energy obtained a valid state permit in accordance with R.C. Chapter 1509, the city cannot "extinguish privileges arising thereunder through the enforcement of zoning regulations." *Westlake v. Mascot Petroleum Co., Inc.,* 61 Ohio St.3d 161, 573 N.E.2d 1068 (1991), paragraph two of the syllabus.

{¶ 29} The city's ordinances create a second type of conflict with R.C. 1509.02. "In determining whether a conflict does exist, a court refers to the language of the statute to determine whether the General Assembly intended to preempt local regulation on the subject." *Westlake v. Mascot Petroleum Co.,* 61 Ohio

St.3d 161, 164, 573 N.E.2d 1068 (1991). *See, e.g., Clermont,* 2 Ohio St.3d 44, 442 N.E.2d 1278; *Ohio Assn. of Private Detective Agencies,* 65 Ohio St.3d at 245, 602 N.E.2d 1147.

{¶ 30} R.C. 1509.02 not only gives ODNR "sole and exclusive authority to regulate the permitting, location, and spacing of oil and gas wells and production operations" within Ohio; it explicitly reserves for the state, to the exclusion of local governments, the right to regulate "all aspects" of the location, drilling, and operation of oil and gas wells, including "permitting relating to those activities." While R.C. 1509.02 preserves the extensive regulatory control given to municipalities over a wide range of infrastructure—from alleys to aqueducts, *see* R.C. 723.01 and 4513.34—it explicitly prohibits them from exercising those powers in a way that "discriminates against, unfairly impedes, or obstructs" the activities and operations covered by R.C. 1509.02.

{¶ 31} In *Clermont,* 2 Ohio St.3d 44, 442 N.E.2d 1278, we rejected a home rule challenge involving a similar provision, which prohibited any political subdivision from requiring additional zoning or other approval for the construction and operation of a state-licensed hazardous-waste facility. *Id.* at 49, quoting R.C. 3734.05(D)(3), now (E). In our view, this language was sufficient to supersede "any conflicting municipal ordinance." *Id.* at 49. We reach the same conclusion here.

{¶ 32} Our recent decision in *Cleveland v. State,* 138 Ohio St.3d 232, 2014-Ohio-86, 5 N.E.3d 644, does not stand for a contrary proposition. In fact, that decision does not even involve the conflict prong of the home-rule analysis. We applied the general-law prong to R.C. 4921.25, the statute granting state regulatory authority over towing companies. *Id.* at ¶ 1, 15. Applying the four-part general-law analysis in *Canton,* 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, we struck down a part of the statute that exempted towing entities from municipal licensing and registration ordinances. *Id.* at ¶ 16. We reasoned that the exemption did not prescribe police, sanitary, or similar regulations, but instead purported only to limit legislative power of a municipal corporation to prescribe police, sanitary, or similar regulations. *Id.* at ¶ 8, 16. We did not decide whether the city ordinances in that case conflicted with general law: "that issue [was] not before us." *Id.* at ¶ 23.

{¶ 33} The city presents a variety of policy reasons why local governments and the state should work together, with the state controlling the details of well construction and operations and the municipalities designating which land within their borders is available for those activities. This is no doubt an interesting policy question, but it is one for our elected representatives in the General Assembly, not the judiciary. The issue before us is not whether the law *should* generally allow municipalities to have concurrent regulatory authority, but wheth-

er R.C. 1509.02 and the Home Rule Amendment *do* allow for the kind of double licensing at issue here. They do not. We make no judgment as to whether other ordinances could coexist with the General Assembly's comprehensive regulatory scheme. Rather, our holding is limited to the five municipal ordinances at issue in this case.

## Conclusion

{¶ 34} Article II, Section 36 vests the General Assembly with the power to pass laws providing for the *"regulation* of methods of mining, weighing, measuring and marketing coal, *oil, gas and all other minerals."* (Emphasis added.) With the comprehensive regulatory scheme in R.C. Chapter 1509, the General Assembly has done exactly that. We hold that the Home Rule Amendment to the Ohio Constitution, Article XVIII, Section 3, does not allow a municipality to discriminate against, unfairly impede, or obstruct oil and gas activities and production operations that the state has permitted under R.C. Chapter 1509.

{¶ 35} Accordingly, we affirm the judgment of the court of appeals.

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY, J., concur.

O'DONNELL, J., concurs in judgment only.

PFEIFER, LANZINGER, and O'NEILL, JJ., dissent.

---

**O'DONNELL, J., separately concurring in judgment only.**

{¶ 36} R.C. 1509.02 vests the Division of Oil and Gas Resources Management of the Ohio Department of Natural Resources ("ODNR") with "sole and exclusive authority to regulate the permitting, location, and spacing of oil and gas wells within the state," and I concur with the determination that this statute preempts local permitting ordinances applicable to the construction and operation of oil and gas wells within the municipality. Here, the city of Munroe Falls precludes drilling for oil and gas without obtaining a permit from the city and complying with its regulations on the technical aspects of drilling. Munroe Falls Codified Ordinances 1329.03. This parallel municipal permitting process for oil and gas wells conflicts with R.C. 1509.02, a general law, and is therefore preempted by R.C. Chapter 1509.

{¶ 37} Munroe Falls also regulates the placement of oil and gas wells through its zoning code as a conditional use in an I–1 (industrial) district, requiring a conditional use certificate before construction or excavation can commence. Munroe Falls Codified Ordinances 1133.03(c). However, in the case of oil and gas wells, the conditional use certificate specified by the zoning code is, in fact, the

same permit required for oil and gas wells pursuant to Munroe Falls Codified Ordinances Chapter 1329. *See* Munroe Falls Codified Ordinances 1141.05(bb)(5) ("[Oil and gas wells] shall conform with all applicable rules and regulations set forth in the Codified Ordinances of the City of Munroe Falls"); 1329.03(a) (prohibiting drilling before a conditional use certificate has been granted). Because the zoning code incorporates the parallel municipal permitting scheme that is applicable only to oil and gas wells before allowing drilling as a conditional use, it too conflicts with general law and is also preempted by R.C. Chapter 1509.

{¶ 38} I write separately to emphasize the limited scope of our decision; "our holding is limited to the five municipal ordinances at issue in this case." Lead opinion at ¶ 33. This appeal does not present the question whether R.C. 1509.02 conflicts with local land use ordinances that address only the traditional concerns of zoning laws, such as ensuring compatibility with local neighborhoods, preserving property values, or effectuating a municipality's long-term plan for development, by limiting oil and gas wells to certain zoning districts without imposing a separate permitting regime applicable only to oil and gas drilling.

{¶ 39} Thus, in my view, it remains to be decided whether the General Assembly intended to wholly supplant all local zoning ordinances limiting land uses to certain zoning districts without regulating the details of oil and gas drilling expressly addressed by R.C. Chapter 1509.

{¶ 40} Because municipal zoning is an exercise of police power, *Hudson v. Albrecht, Inc.,* 9 Ohio St.3d 69, 72, 458 N.E.2d 852 (1984), municipalities have the authority pursuant to Article XVIII, Section 3 of the Ohio Constitution to enact zoning ordinances that are not in conflict with general laws. As we recently recognized in *Cleveland v. State,* 138 Ohio St.3d 232, 2014-Ohio-86, 5 N.E.3d 644, "The General Assembly may not by statute prohibit the municipal home-rule authority granted by Article XVIII, Section 3 of the Ohio Constitution," *id.* at ¶ 24, and "municipalities may supplement state law in * * * unregulated areas, provided that the city ordinances do not conflict with general laws," *id.* at ¶ 16.

{¶ 41} Importantly, a municipality's authority to enact zoning ordinances does not flow solely from the Ohio Constitution. R.C. 713.07 expressly provides that municipalities,

in the interest of the promotion of the public health, safety, convenience, comfort, prosperity, or general welfare, may regulate and restrict the location of buildings and other structures and of premises to be used for trade, industry, residence, or other specified uses, and for such purposes may divide the municipal corporation into districts of such number, shape, and area as are best suited to carry out the purposes of this section.

Thus, in addition to power derived from the Home Rule Amendment, municipalities have statutory authority to regulate land uses within zoning districts to promote the public health, safety, convenience, comfort, prosperity, and general welfare.

{¶ 42} We are obliged to accord "a strong presumption * * * in favor of the validity of [a zoning] ordinance." *Albrecht* at 71. In addition, R.C. 1.51 provides that when statutory provisions such as R.C. 1509.02 and 713.07 appear to conflict, "they shall be construed, if possible, so that effect is given to both." Generally, when construing a statute, our paramount concern is "the legislative intent in the statute's enactment, and to discern this intent, we read words and phrases in context according to the rules of grammar and common usage." *Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 13. But pursuant to R.C. 1.42, "Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

{¶ 43} R.C. 1509.02 vests ODNR with sole and exclusive authority to regulate the location and spacing of oil and gas wells, but "location" and "spacing" have specialized, technical meanings in oil and gas law. As a leading treatise explains:

> The purposes of statutes and administrative orders fixing the location of oil and gas wells with respect to surface property lines and other wells are to protect the rights of land or mineral owners by preventing net drainage between tracts, to prevent economic waste resulting from the draining of unnecessary wells and to prevent physical waste which may be caused by crowded drilling operations.

1 Summers, *The Law of Oil & Gas,* Section 5.1, at 268 (3d Ed.2004). The "spacing and location of wells * * * maximize the efficient production of oil and gas," *id.*, Section 1.8, at 7, and protect correlative rights. *See Bernstein v. Bush,* 29 Cal.2d 773, 780, 177 P.2d 913 (1947) ("The wasteful use of offset wells was recognized as one of the evils sought to be minimized by the enactment of well spacing regulations"); *Samson Resources Co. v. Corp. Comm.,* 1985 OK 31, 702 P.2d 19, 22 (explaining that location and spacing orders are justified by the public interest in correlative rights); *Coastal Oil & Gas Corp. v. Garza Energy Trust,* 268 S.W.3d 1, 15 (Tex.2008) (noting that spacing and density orders protect correlative rights of land owners while serving the state interest in conserving natural resources).

{¶ 44} The terms "location" and "spacing" thus relate to the placement of wells on a tract in relation to the resource pool and to each other. Scientific expertise regarding the physical characteristics of oil and gas reserves is required to

efficiently produce oil and gas, prevent waste, and protect the correlative rights of neighbors, which is the basis for regulating the location and spacing of wells in the first place. *See generally* 1 Summers, *The Law of Oil & Gas,* Sections 3.9 and 4.28. In contrast, that same scientific and regulatory expertise is not required to determine whether an oil and gas well is compatible with the character and aesthetics of a particular zoning district, such as a residential neighborhood, and we generally presume that zoning authorities are far more familiar with local conditions and therefore are better able to make land use decisions. *See generally Albrecht,* 9 Ohio St.3d at 71, 458 N.E.2d 852. We also expect that those who make land use decisions will be directly accountable to the people affected by them. Regulators at ODNR, on the other hand, are not.

{¶ 45} Courts of last resort in other jurisdictions have declined to view preemptive language in oil and gas statutes that preclude all local regulation of oil and gas drilling as irreconcilable with local zoning laws. In *Wallach v. Dryden,* 23 N.Y.3d 728, 992 N.Y.S.2d 710 (2014), the Court of Appeals of New York held that a statute expressly superseding all local laws "relating to the regulation" of the oil and gas industry "preempt[s] only local laws that purport to regulate the actual operations of oil and gas activities, not zoning ordinances that restrict or prohibit certain land uses within town boundaries." *Id.* at 744, 746. The Supreme Court of Pennsylvania in *Huntley & Huntley, Inc. v. Oakmont Borough Council,* 600 Pa. 207, 964 A.2d 855 (2009), concluded that a statute superseding all municipal ordinances purporting to regulate oil and gas well operations does not preempt a local zoning restriction excluding oil and gas wells from certain residential districts. *Id.* at 225–226. The Supreme Court of Colorado, in holding that state regulation of the oil and gas industry did not preempt a county's land use authority, put it aptly in explaining that "we reasonably may expect that any legislative intent to prohibit a county from exercising its land-use authority over those areas of the county in which oil development or operations are taking place or are contemplated would be clearly and unequivocally stated." *La Plata Cty. Bd. of Commrs. v. Bowen/Edwards Assocs., Inc.,* 830 P.2d 1045, 1057 (Colo.1992).

{¶ 46} In enacting R.C. Chapter 1509, the General Assembly sought to preempt the inconsistent patchwork of local health and safety regulations governing the technical aspects of drilling that had been permitted by the former version of the statute. *See generally Newbury Twp. Bd. of Trustees v. Lomak Petroleum (Ohio), Inc.,* 62 Ohio St.3d 387, 389, 583 N.E.2d 302 (1992) (noting that former R.C. 1509.39 had provided that "local governments are not prevented from enacting and enforcing health and safety standards for the drilling and exploration of oil and gas, provided that they are not less restrictive than existing state requirements"). If the legislature had intended to override all local zoning ordinances that affect oil and gas drilling, it could have declared that intent, such

as it did in the case of hazardous waste facilities, R.C. 3734.05(E), public utilities, R.C. 519.211(A), casinos, R.C. 3772.26(A), and licensed residential facilities, R.C. 5123.19(P). It could also have created a statutory scheme that addresses local land use and planning issues. Yet it did not do so.

{¶ 47} Nothing in R.C. Chapter 1509 expressly addresses zoning or requires ODNR to regulate the location of oil and gas wells to ensure compatibility with local land use, preserve property values, effectuate a municipality's long-term plan for development, or uphold any of the other traditional goals of zoning. It has not addressed those matters and instead permits ODNR to deny an oil and gas well permit if "there is a substantial risk that the operation will result in violations of this chapter or rules adopted under it that will present an imminent danger to public health or safety or damage to the environment." R.C. 1509.06(F).

{¶ 48} Accordingly, whether a municipality has authority to enact zoning ordinances that affect oil and gas wells within its territory is a question yet to be decided, and for that reason, I concur in the resolution of this case.

KENNEDY, J., concurs in the foregoing opinion.

_____

PFEIFER, J., dissenting.

{¶ 49} The oil booms keep coming in Ohio. With booms come creative and desperate methods of staking a claim. In the 1890s, Ohio became the site of some of the world's first offshore drilling, as oil derricks were constructed in the middle of Grand Lake St. Mary's. Oeters & Gulick, *Images of America: Miami and Erie Canal* 79 (2014). It's said that during the boom in the villages of Bremen and New Straitsville in the early 1900s, "[w]ells were often so close together that a person could jump from one derrick floor to another." Spencer, *A Journey Through Two Early Ohio Oil Booms: The Northwest Ohio and the Bremen–New Straitsville Booms,* Oil–Industry History (Dec. 2008), abstracted at http://www.petroleumhistory.org/journal/vol_9.html# spencer. In the 1960s in Morrow County, "wells [could] be seen in farm fields and backyards, around cemeteries and even on home-plate of what was a schoolyard baseball diamond in the village of Edison." *Oil Wells Bloom in Morrow County, 1 in Every 4 Good,* Sandusky Register (Feb. 3, 1964) 5.

{¶ 50} It appears that the General Assembly has attempted to bring order to Ohio's historically scattershot way of dealing with oil booms. I would find that R.C. 1509.02 leaves room for municipalities to employ zoning regulations that do not conflict with the statute. By leaving some space for local control, the General Assembly has recognized that a "big picture" approach with local input is the best

way to encourage the responsible and sustainable development of Ohio's natural resources.

{¶ 51} Accordingly, I join Justice Lanzinger's dissent.

---

LANZINGER, J., dissenting.

{¶ 52} Because it is not clear to me that the Munroe Falls zoning ordinances actually conflict with a general state statute, I respectfully dissent. I believe that local zoning ordinances can have a place beside the state's statutes regulating oil and gas activities.

{¶ 53} The lead opinion restricts home-rule power using language from R.C. 1509.02, which sets forth the General Assembly's intent to create the Division of Oil and Gas Resources Management within the Department of Natural Resources:

> Nothing in this section affects the authority granted to the director of transportation and local authorities in section 723.01 or 4513.34 of the Revised Code, provided that the authority granted under those sections shall not be exercised in a manner that discriminates against, unfairly impedes, or obstructs oil and gas activities and operations regulated under this chapter.

{¶ 54} But R.C. 723.01 relates to public roads, and R.C. 4513.34 to certain highway permits. Neither mentions local zoning ordinances.

{¶ 55} Article II, Section 36 of the Ohio Constitution vests the General Assembly with the power to pass laws providing for the "regulation of *methods of mining, weighing, measuring and marketing* coal, oil, gas and all other minerals." (Emphasis added.) R.C. 1509.02 has broad language stating that "regulation of oil and gas activities is a matter of general statewide interest that requires uniform statewide regulation" and that R.C. Chapter 1509 constitutes "a comprehensive plan with respect to all aspects of the locating, drilling, well stimulation, completing, and operating of oil and gas wells within this state, including site construction and restoration, permitting related to those activities, and the disposal of wastes from those wells."

{¶ 56} But the broad language of a preemption clause is not sufficient to create a conflict. We have never held that a preemption statement alone is sufficient to divest municipalities of their constitutional right to home rule. To the contrary, a declaration by the General Assembly of its intent to preempt a field of legislation

"does not trump the constitutional authority of municipalities to enact legislation pursuant to the Home Rule Amendment, provided that the local legislation is not in conflict with general laws." *Am. Fin. Servs. Assn. v. Cleveland,* 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, ¶ 31. *See also Ohioans for Concealed Carry, Inc. v. Clyde,* 120 Ohio St.3d 96, 2008-Ohio-4605, 896 N.E.2d 967, ¶ 29.

{¶ 57} While important in determining whether a statute is a general law, a preemption statement alone has no relevance to the existence or nonexistence of any conflict between local and state regulations.

*R.C. 1509.02 does not specifically prohibit local zoning regulation*

{¶ 58} An examination of R.C. Chapter 1509 and regulations governing the drilling of oil and gas wells reveals that there is no explicit reference to local zoning. "In order for such a conflict [between state laws and local ordinances] to arise, the state statute must positively permit what the ordinance prohibits, or vice versa, regardless of the extent of state regulation concerning the same object." *Cincinnati v. Hoffman,* 31 Ohio St.2d 163, 169, 285 N.E.2d 714 (1972). R.C. 1509.02 subjects the drillers of oil and gas wells to the supervision of a state agency—the Ohio Department of Natural Resources ("ODNR"). But the statute itself does not set forth any requirements that conflict with the city's zoning ordinances. Nor does R.C. 1509.02 purport to take away authority from municipalities in enacting their own police, sanitary, and other similar regulations in this area. The vague declaration of intent to occupy the field is insufficient to show an actual conflict, and nothing in the statute expressly prohibits supplemental, nonconflicting local regulation. There is room for both state and local regulation for the drilling of oil and gas.

{¶ 59} A recent case is illustrative. We recently severed part of R.C. 4921.25 because it purported to preempt or limit legislative power of municipal corporations to pass police, sanitary, or similar regulations relating to tow-truck operations. *Cleveland v. State,* 138 Ohio St.3d 232, 2014-Ohio-86, 5 N.E.3d 644, ¶ 16. We relied on Article XVIII, Section 3 of the Ohio Constitution, which provides that "[m]unicipalities shall have authority * * * to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." *Id.* at ¶ 16. Although the statute had subjected towing entities to regulation by the Public Utilities Commission, we recognized that there were areas that might not be regulated by the PUCO, thus allowing municipalities to supplement the state law. *Id.* Because the second sentence of R.C. 4921.25 attempted to eliminate any municipal regulation, we held that it violated the Home Rule Amendment. *Id.*

{¶ 60} The General Assembly knows how to specifically prohibit the enforcement of local zoning ordinances as part of a statewide and comprehensive legislative scheme. *See, e.g.,* R.C. 3734.05(E) (hazardous waste—"No political

subdivision of this state shall require any additional zoning or other approval, consent, permit, certificate, or condition for the construction or operation of a hazardous waste facility"); R.C. 3772.26(A) (casinos—"no local zoning, land use laws, subdivision regulations or similar provisions shall prohibit the development or operation of the four casino facilities"); R.C. 5103.0318 (foster homes—"No municipal, county, or township zoning regulation shall require a conditional permit or any other special exception certification for any certified foster home"); R.C. 5104.054 (day-care homes—"No municipal, county, or township zoning regulations shall require a conditional use permit or any other special exception certification for any such type B family day-care home"). R.C. Chapter 1509 has no similar language.

*Municipalities may supplement general law with nonconflicting zoning ordinances*

{¶ 61} The city's argument that there is no conflict because its ordinances and R.C. Chapter 1509 regulate different things is not "fanciful." Lead opinion at ¶ 28. The ordinances reflect traditional zoning concerns, while the state statutes control technical aspects of the drilling of an oil and gas well. Local zoning exists to address such concerns as traffic control, traffic volume, property values, enhancement of municipal revenue, costs of municipal improvement, land use, nuisance abatement, and the general welfare and development of the community as a whole. *Willott v. Beachwood,* 175 Ohio St. 557, 560, 197 N.E.2d 201 (1964). Municipalities are more familiar with local conditions and are in the best position to determine which zoning regulations will best promote the health, safety, and general welfare of their communities. *Hudson v. Albrecht, Inc.,* 9 Ohio St.3d 69, 71–72, 458 N.E.2d 852 (1984). This is why a "strong presumption" exists in favor of the validity of the ordinances, *id.,* a fact that the lead opinion does not mention.

{¶ 62} Several cases are cited for the proposition that zoning regulations may not prohibit state licensing. But two of the cases sidestepped any discussion of zoning. *See Auxter v. Toledo,* 173 Ohio St. 444, 449, 183 N.E.2d 920 (1962) (addressing a local liquor licensing ordinance and expressly declining to consider either the validity of any other local provisions purporting to regulate the business of selling liquor or the effect of municipal zoning regulations on that business); *Anderson v. Brown,* 13 Ohio St.2d 53, 59, 233 N.E.2d 584 (1968) (addressing portions of a township ordinance regulating health, safety, and licensing of trailer parks, but refusing to address other portions of the ordinance, which "may or may not be able to stand as zoning regulations"). Aside from one case, the others did not mention zoning at all.

{¶ 63} In *Westlake v. Mascot Petroleum Co., Inc.,* 61 Ohio St.3d 161, 573 N.E.2d 1068 (1991), we did hold that a municipality could not extinguish a state liquor license through local zoning enforcement. But that decision rested in large

part on statutory amendments that reserved the authority to regulate the sale and consumption of alcoholic beverages *exclusively and unambiguously* for the state. *Id.* at 167–168. The same is not true here.

{¶ 64} What I believe must be recognized is that the state and the local authority have differing interests in this important matter. The purpose of comprehensive local zoning is the exercise of local police power to promote the health, safety, and general welfare of the public. *Negin v. Mentor Bd. of Bldg. & Zoning Appeals,* 69 Ohio St.2d 492, 495, 433 N.E.2d 165 (1982). The purpose of R.C. Chapter 1509 is to regulate methods of producing oil and gas statewide. R.C. 1509.02. These legislative purposes are distinct, and together they present dual conditions to the operation of the oil and gas industry.

{¶ 65} The five ordinances of Munroe Falls were struck down by the court of appeals as though the city were attempting to impose its own requirements on the oil and gas drilling industry. The court of appeals looked at the ordinances as supplanting rather than as supplementing state regulation. No court has yet examined whether these city ordinances can stand separate and apart as zoning regulations that supplement the state regulatory scheme. I would return this case to the appellate court to do so.

{¶ 66} This case illustrates again the tension between local and state authorities and the exercise of the powers granted to each by the Constitution. At the very least, there should be recognition of the distinct concerns of each legislative level and increased intergovernmental negotiations at the earliest opportunity.

*Other states have harmonized state and local regulation*

{¶ 67} Other jurisdictions have determined that local zoning is distinct from state regulation of the oil and gas industry and have decided that local and state governments can work together. For example, the Colorado Supreme Court rejected an oil and gas developer's request for a judgment declaring that the Colorado Oil and Gas Conservation Act preempted a county's land-use regulations pertaining to oil and gas activities. *La Plata Cty. Bd. of Commrs. v. Bowen/Edwards Assoc., Inc.,* 830 P.2d 1045 (Colo.1992). The Colorado Supreme Court concluded that state and local interests were distinct and not in express conflict, stating:

> While the governmental interests involved in oil and gas development and in land-use control at times may overlap, the core interests in these legitimate governmental functions are quite distinct. The state's interest in oil and gas development is centered primarily on the efficient production and utilization of the natural resources in the state. A county's interest in land-use control, in contrast, is one of orderly development and use of land

in a manner consistent with local demographic and environmental concerns. Given the rather distinct nature of these interests, we reasonably may expect that any legislative intent to prohibit a county from exercising its land-use authority over those areas of the county in which oil development or operations are taking place or are contemplated would be clearly and unequivocally stated. We, however, find no such clear and unequivocal statement of legislative intent in the Oil and Gas Conservation Act.

*Id.* at 1057. In rejecting the notion that the state and local regulations were impliedly in conflict, the court stated:

The state's interest in oil and gas activities is not so patently dominant over a county's interest in land-use control, nor are the respective interests of both the state and the county so irreconcilably in conflict, as to eliminate by necessary implication any prospect for a harmonious application of both regulatory schemes.

*Id.* at 1058.

{¶ 68} In a companion case, the Colorado Supreme Court determined that state law did preempt a city's home-rule authority to ban *all* oil and gas development and production within its borders. *Voss v. Lundvall Bros., Inc.*, 830 P.2d 1061 (Colo.1992). But it also stated:

If a home-rule city, instead of imposing a total ban on all drilling within the city, enacts land-use regulations applicable to various aspects of oil and gas development and operations within the city, and if such regulations do not frustrate and can be harmonized with the development and production of oil and gas in a manner consistent with the stated goals of the Oil and Gas Conservation Act, the city's regulations should be given effect.

*Id.* at 1068–1069.

{¶ 69} The Pennsylvania Supreme Court found the reasoning in *La Plata* persuasive in deciding a similar issue. *Huntley & Huntley, Inc. v. Oakmont Borough Council*, 600 Pa. 207, 225, 964 A.2d 855 (2009). The preemption language in Pennsylvania's Oil and Gas Act was limited to certain subjects. Because "the [zoning ordinance] serves different purposes from those enumerated in the Oil and Gas Act," the ordinance in question could not be considered to be preempted without clearer guidance from the legislature that the restriction in

the ordinance was among the subjects covered by the preemption. *Id.* at 225–226.

{¶ 70} Most recently, the New York Court of Appeals was asked to determine whether towns may ban or limit oil and gas production within their boundaries under their home-rule authority by adopting local zoning laws. *Wallach v. Dryden*, 23 N.Y.3d 728, 992 N.Y.S.2d 710, 16 N.E.3d 1188 (2014). The court concluded that the statewide Oil, Gas and Solution Mining Law ("OGSML") does not preempt the home-rule authority vested in municipalities to regulate land use. *Id.* at 739. It is well worth examining the facts and circumstances of this case because it has many similarities to ours.

{¶ 71} As in Ohio, municipal home-rule authority in New York arises from the state's Constitution. Under the New York Constitution, Article IX, Section 2(c)(ii), "every local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law * * * except to the extent that the legislature shall restrict the adoption of such a local law." The adoption of zoning ordinances is viewed as one of the core powers of local governance. *Id.* at 743. The appellants had acquired oil and gas leases in municipalities that banned such activity and claimed that local zoning was preempted by the OGSML, which states:

> The provisions of this article shall supersede all local laws or ordinances relating to the regulation of the oil, gas and solution mining industries; but shall not supersede local government jurisdiction over local roads or the rights of local governments under the real property tax law.

N.Y.Envtl.Conserv.Law 23–0303(2); *see id.* at 744.

{¶ 72} The New York Court of Appeals rejected the notion that the preemption clause should be read broadly to preempt local zoning ordinances. It stated that the preemption clause was "most naturally read as preempting only local laws that purport to regulate the actual operations of oil and gas activities, *not zoning ordinances* that restrict or prohibit certain land uses within town boundaries." (Emphasis added.) *Id.* at 746. The court also noted that unlike the OGSML's preemption clause, other statutes had clearly preempted home-rule zoning power while taking into account local considerations that otherwise would have been protected by traditional municipal zoning powers. *Id.* at 748. It held that because there was no inconsistency between the preservation of local zoning authority and the OGSML's policies of preventing waste and promoting recovery of oil and gas, local zoning would not be preempted without a clear expression of that intent.

{¶ 73} In states like Oklahoma, municipalities are authorized by statute to establish zones for the drilling of oil and gas wells. *See Vinson v. Medley*, 737 P.2d 932, 936 (Okla.1987). Other states have also recognized by regulation that local zoning can coexist with state laws regarding oil and gas development. *See* Cal.Pub.Res.Code 3690 (stating that the oil and gas law shall not be deemed a preemption of existing rights of cities and counties to regulate oil-production activities); Wyo. Rules & Regs., Oil & Gas Conservation Comm., Chap. 2, Section 1(b) (stating that owner or operator of oil and gas wells must also comply with applicable federal, local, or other state permits or regulatory requirements).

{¶ 74} I contend that Ohio, too, should make an effort to harmonize the laws of the state and local municipalities to avoid preemption, if possible. *See N. Ohio Patrolmen's Benevolent Assn. v. Parma*, 61 Ohio St.2d 375, 377, 402 N.E.2d 519 (1980). R.C. Chapter 1509 does not expressly prohibit the enforcement of local zoning ordinances. Municipal zoning ordinances differ from, and can coexist with, R.C. Chapter 1509 and its statewide regulations governing drilling.

*Conclusion*

{¶ 75} There is no need for the state to act as the thousand-pound gorilla, gobbling up exclusive authority over the oil and gas industry, leaving not even a banana peel of home rule for municipalities. I would reverse the judgment of the court of appeals and remand to that court for further proceedings.

PFEIFER and O'NEILL, JJ., concur in the foregoing opinion.

———————

**O'NEILL, J., dissenting.**

{¶ 76} I join Justice Lanzinger's well-written dissent. Let's be clear here. The Ohio General Assembly has created a zookeeper to feed the elephant in the living room. What the drilling industry has bought and paid for in campaign contributions it shall receive. The oil and gas industry has gotten its way, and local control of drilling-location decisions has been unceremoniously taken away from the citizens of Ohio. Under this ruling, a drilling permit could be granted in the exquisite residential neighborhoods of Upper Arlington, Shaker Heights, or the village of Indian Hill—local zoning dating back to 1920 be damned.

———————

Amer Cunningham Co., L.P.A., Jack Morrison Jr., Thomas M. Saxer, and Thomas R. Houlihan, for appellant.

Vorys, Sater, Seymour & Pease, L.L.P., and John K. Keller, for appellees.

Richard C. Sahli; and EarthJustice and Deborah Goldberg, urging reversal for amici curiae health professionals Peggy Ann Berry, Samuel Kocoshis, Deborah Cowden, Katie Huffling, Angela Novy, Conleth Crotser, Bill Lonneman, Janalee Stock, Sue Papp, Rosemary Valedes Chaudry, Elaine McSweeney, Jonalea Neider, and Physicians, Scientists, and Engineers for Healthy Energy.

Natural Resources Defense Council, Meleah Geertsma, Katherine Sinding, and Peter Precario, urging reversal for amici curiae cities of Broadview Heights, Euclid, Mansfield, and North Royalton, and village of Amesville.

Morrison & Bindley and David C. Morrison, urging reversal for amicus curiae city of Heath.

William W. Ellis, Jr. Ohio Environmental Law Center and Trent A. Dougherty, urging reversal for amici curiae Ohio local businesses Athens Electric, Cherry Orchards, Design Council, Donkey Coffee, Enviroscapes Landscaping Design, Fox Natural Builders, The Going Green Store, Green Edge Organic Gardens, Haulin' Hoof, Herbal Sage, High Bottom Farm, Hyacinth Bean Florist, Laurel Valley Creamery, Mustard Seed Market, Shew's Orchard, Snowville Creamery, Sticky Pete's Maple Syrup, Sunpower, Inc., Village Bakery, Wide Angle Ranch, Zan Small Business Solutions, L.L.C., Kenneth Messinger–Rapport, Attorney L.L.C., Patricia Walker, attorney at law, retired business owners Donald Baker and Pam Miller (Gramercy Gallery), Louie Chodkiewz–Real Estate Broker, and Shirley Sinn–Oil & Gas Consulting.

Ice Miller, L.L.P., and Patrick A. Devine, urging affirmance for amicus curiae Ohio Contractors Association.

Michael DeWine, Attorney General, Eric E. Murphy, State Solicitor, and Peter K. Glenn–Applegate, Deputy State Solicitor, urging affirmance for amicus curiae state of Ohio.

Kincaid, Taylor & Geyer, William J. Taylor, and Scott D. Eickelberger, urging affirmance for amicus curiae Ohio Oil and Gas Association.

Chorpenning, Good & Pandora Co., L.P.A., and Brian E. Chorpenning, urging affirmance for amici curiae Artex Oil Company, Eclipse Resources I, L.P., EnerVest Operating, L.L.C., Hess Ohio Developments, L.L.C., Hilcorp Energy Company, Paloma Resources, L.L.C., Sierra Resources, L.L.C., and American Energy Partners L.P.

Brady, Coyle & Schmidt, Ltd., Brian P. Barger, and Amanda L. Coyle, urging affirmance for amici curiae Ohio Aggregates Association, Ohio Ready Mixed Concrete Association, and Flexible Pavements of Ohio.

Benjamin Norris; Sidley Austin, L.L.P., Roger R. Martella Jr., Joseph R. Guerra, Samuel B. Boxerman, and Lowell J. Schiller; Porter, Wright, Morris & Arthur, L.L.P., and Kathleen M. Trafford; Linda Woggon; and Wuliger, Fadel &

Beyer and Timothy R. Fadel, urging affirmance for amici curiae American Petroleum Institute, Ohio Chamber of Commerce, Canton Regional Chamber of Commerce, Youngstown/Warren Regional Chamber, and International Union of Operating Engineers, Local 18.