IN RE APPLICATION OF BLACKWELL.

[Cite as *In re Application of Blackwell,*
116 Ohio St.3d 530, 2007-Ohio-6041.]

(No. 2007–0441—Submitted August 14, 2007—Decided November 15, 2007.)

**Per Curiam.**

{¶ 1} Rahshann K. Blackwell of Denver, Colorado, is a candidate for admission to the Ohio bar and has applied to take the Ohio bar examination. The Board of Commissioners on Character and Fitness reviewed applicant's qualifications for admission to the bar after the Board of Bar Examiners disqualified his July 2005 bar exam for his failure to comply with testing protocol. The character and fitness board recommends that we disapprove the applicant because, among other reasons, he is at this time psychologically unfit to enter the practice of law.

{¶ 2} Applicant objects to this recommendation, arguing mainly that his conduct during the bar exam warranted neither the disqualification of his exam results nor an adverse assessment of his character and fitness. We, however, agree that applicant is not now psychologically prepared for the rigors of practicing law. We thus overrule the objections and accept the character and fitness board's recommendation to disapprove his application to take the Ohio bar exam. We further accept the recommendation that applicant be permitted, on conditions for his psychological treatment and reassessment, to apply to take the bar exam to be administered in February 2009.

I.  Events Leading to Review by the Board of
Commissioners on Character and Fitness

{¶ 3} Applicant graduated from law school in May 2000. He has taken and failed the Ohio bar examinations administered in July 2000, February 2001, July 2001, and July 2003. His attempts to pass the July 2003 and July 2005 exams each resulted in charges that he violated exam protocol by continuing to write on portions of the exams after the time allotted.

{¶ 4} The case now before us began after the July 2005 exam, when the Board of Bar Examiners received for a second time allegations that applicant may have

cheated on the test. As background, however, we include in our review the circumstances under which applicant was first charged with this infraction.

{¶ 5} After the July 2003 bar exam, the Board of Bar Examiners conducted a hearing on the charges against applicant. In October 2003, the board disqualified applicant's answers to five essay questions because he had completed certain segments after time was called. This disqualification prevented applicant from achieving a passing score on the bar exam.

{¶ 6} The character and fitness board then invoked its sua sponte investigative authority pursuant to Gov.Bar R. I(10)(B)(2)(e) and appointed a panel to hear the matter. Applicant presented at that hearing compelling testimony as to his good character and fitness and convinced the panel that he would not repeat the mistakes he had made during the July 2003 exam. The panel thus recommended approval of applicant's character, fitness, and moral qualifications. In July 2004, the character and fitness board accepted the panel recommendation and approved applicant to apply to take the bar exam again.

{¶ 7} Applicant attempted to apply to take the November 2004 bar exam, but this court's Office of Bar Admissions rejected his application as incomplete. Applicant next applied to take the July 2005 bar examination. The admissions committee for the Hardin County Bar Association approved applicant's character, fitness, and moral qualifications, and he sat for the exam. Again, applicant's test-taking generated a complaint, and four witnesses, including former Supreme Court Clerk Marcia Mengel, reported alleged improprieties to the Board of Bar Examiners.

{¶ 8} Having considered these witness reports, applicant's statement, and the fact that he had been sanctioned before for the same infraction, the Board of Bar Examiners disqualified applicant's 2005 bar examination and referred the matter to the character and fitness board for further review.

{¶ 9} In September 2005, the character and fitness board again invoked its sua sponte investigative authority and appointed a panel to hear applicant's second case. The panel heard the matter in January 2007, after granting two continuances. One continuance occurred at the last minute because the applicant had failed to obtain a promised psychological evaluation until several days before the hearing and because his doctor was unavailable to testify on the hearing date. Another occurred because of applicant's last-minute request to rehire the lawyer that he had discharged earlier in the proceedings.

{¶ 10} In the meantime, on May 10, 2006, applicant applied to take the July 2006 bar examination. The bar admissions office conditionally approved his application pending timely approval of his character, fitness, and moral qualifications.

{¶ 11} In February 2007, the hearing panel recommended disapproval of applicant's bar-exam application. The panel also recommended that applicant be permitted to reapply to take the February 2009 bar exam, providing that he complies with conditions for his psychological treatment and reassessment. The character and fitness board accepted this recommendation.

## II. Evidence Substantiates the Findings of the Character and Fitness Board

{¶ 12} The character and fitness board convened the underlying proceedings primarily to look into the events that led the Board of Bar Examiners to disqualify applicant's 2005 bar exam. The character and fitness board also warned applicant, however, that "any issues relating to" his character, fitness, and moral qualifications were subject to review. Additional issues did, in fact, arise.

{¶ 13} In addition to his difficulties with taking the bar exam, the character and fitness board learned of several other concerns that implicated applicant's qualifications for bar admission. As one example, applicant failed to disclose in his July 2005 bar application materials that since his previous application, he had been arrested and charged for traffic offenses and had also been sued. Moreover, applicant suffers from a depressive disorder and has abnormal personality traits that prevent him from fulfilling the essential requirements to engage in the practice of law. Indeed, according to expert testimony, applicant's problems in applying for and taking the bar examination are manifestations of his psychological profile.

### A. Violations of Bar Exam Protocol

{¶ 14} On the first day of the July 2005 bar exam, during the afternoon session, applicant changed a word in his answer to an essay question after having been instructed to stop writing. After the incident, applicant told a proctor that he had finished his answer by correcting a misspelled word after the time allotted. His explanation led the proctor to dismiss the incident as too minor to report.

{¶ 15} Applicant did not then realize that another applicant had reported him that morning and that Mengel had asked Rosey Smith, an employee in the bar admissions office, to observe his actions that afternoon. Smith recalled that when Mengel called time at 3:00 p.m., applicant had stopped writing and had put down his pen. As Mengel had continued to speak, however, applicant had picked up his pen and continued to write. Using a stopwatch, Smith had timed applicant's writing for an additional 4.45 seconds.

{¶ 16} Paraphrasing from the panel's report, the board described what happened later that first day of the exam, after all applicants had been excused:

{¶ 17} "Ms. Smith was in the proctor room, a restricted area. The applicant entered the room and walked through it, ignoring Ms. Smith's instructions to stop. When she finally caught up to him, she cautioned him that he was in an unauthorized area. He apologized, but asked if he could talk to someone about 'his situation.' When asked what his situation was, the applicant replied he had continued to write after time was called. Ms. Smith told him to speak with Ms. Mengel, who was still in the front of the examination room. Despite initially having difficulty understanding what he was saying, Ms. Mengel testified that he said: 'I did it again. I wrote after time was called.' He explained that he had written the word 'Thompson' at the end of his answer to an essay question when the word should have been 'Thomas,' and then had changed it after time was called. He indicated he had told an exam proctor what he had done and the proctor told him not to worry about it. * * * He apologized and told Mengel he did not want this to reflect badly on his law license. He wanted to know if he could change the name back to 'Thompson' from 'Thomas' so that the grader could deduct a point for using the wrong name. Mengel told him the mistake was probably so minor that it was unlikely that an entire point would be deducted. The applicant said he just wanted his exam to be perfect and that is why he changed the name after time had been called. Mengel explained to him that she was not authorized to allow him to * * * change his answer back, but that he could write down what occurred along with any proposal for correcting his answer; his explanation would be given to the Board of [Bar] Examiners. Ms. Mengel gave him until the following day to provide his written explanation. She again explained to him that her job was simply to compile the facts of the incident and to inform the Board of Bar Examiners. At that point in time the applicant became somewhat distressed. Several times he said he was appealing to her as a fair person and on a personal level. He just wanted an opportunity to change the name on the exam. His continued beseeching of her to allow him to rectify his mistake led Mengel to believe that he was attempting to get her not to report the matter to the Board of Bar Examiners. She once more reminded him that she was just a collector of information, that the ultimate decision was up to the Board of Bar Examiners and that he could make his proposal to that Board in writing. Mengel testified at the hearing that her impression that he wanted her not to report the matter to the Board was buttressed by the written statement he gave her the next day. That statement did not mention any reference to changing the name back to 'Thompson' from 'Thomas' but was merely an explanation of what had taken place."

{¶ 18} Applicant attempted to explain his actions at the panel hearing, but he instead revealed his eccentric and, at times, irrational tendencies. Applicant reported that he had gone to the testing site the day before the bar exam and had slept that night in his car in the parking lot because he did not want to be late.

He was late to the exam anyway, entering the testing area during the oral instructions and minutes before the test began. Before the exam, he had consciously resolved not to write anything in answer to a question after an instruction to stop and had planned to visualize someone looking over his shoulder during the exam to prevent this behavior. Without any real understanding as to whether this might actually help, he also tried "very hard" during the exam to put his pen down 15 to 20 seconds before time had expired.

{¶ 19} With respect to the particular essay in question, applicant testified that he had initially put down his pen at the end of the response time. But then, he noticed that he had written the name of a client as "Thompson" when he had intended to write "Thomas." Applicant told the panel that he had wanted his answer to be "perfect" and recalled having felt so driven to correct the mistake that he would have "yelled out to the top of [his] lungs in that exam hall" if he had not. To avoid yelling out loud, he had then picked up his pen, scratched out the last four letters of "Thompson," and had written "as" above it.

{¶ 20} Applicant recalled talking to the proctor after the incident, and when she did not consider the incident reportable, he returned to his seat to finish the rest of that day's testing. But after the testing ended, applicant brooded in the parking lot about what he had done. He repeatedly explained to the panel that he had not wanted any "unfair advantage" over the other applicants and did not want anyone to have reason to think that he had to cheat to pass the bar exam. Applicant soon worked himself up so much that he felt compelled to return to the examination hall, where in his desperation, he had the conversation to which Mengel testified.

{¶ 21} Applicant denied that he had tried to prevent Mengel from reporting his conduct to the Board of Bar Examiners. He insisted that he had wanted Mengel only to allow somebody to delete the change he had made after time had run out. Apparently in his mind, this correction would allow the Board of Bar Examiners to contend with his infraction as simply an error for which a point might be taken off his score and without the necessity of more proceedings before that board.

B. Failure to Disclose Prior Legal Proceedings

{¶ 22} The 2005 Re-examination Character Questionnaire required applicant to disclose his involvement, other than as a witness, in (1) "any civil or administrative action or legal proceeding" or (2) "any criminal or quasi-criminal action of legal proceeding (including, but not limited to a misdemeanor, minor misdemeanor, traffic offense or felony)" since his last application.

{¶ 23} Applicant filed his fifth application to take the bar exam on March 30, 2005. To do so, he made small updates on the re-examination character questionnaire that had been rejected in 2004 and simply resubmitted that

document, including the same, and now invalid, notarized signature page. He did not disclose in the March 30 application that after his fourth bar-exam application, the University of Denver had sued him for approximately $6,200 in past-due tuition. He also did not disclose in the March 30 application that he had been arrested and charged on March 22, 2005, with four traffic violations. And incredibly, applicant had called from the Colorado jail at which he was being detained after the arrest to tell his secretary to mail the March 30 application.

{¶ 24} Applicant eventually reported his arrest to the bar admissions office after the dismissal of all but a charge for driving a defective vehicle. But he had a duty to disclose both the arrest and the tuition lawsuit before filing any later bar-exam application. At the hearing, applicant guessed that he may have failed to disclose the lawsuit because he did not have details, such as the case number, to report about the case. He said that he did not report his arrest because he was in jail and wanted to meet the April 1 bar-exam application deadline.

## C. Lack of Psychological Fitness

{¶ 25} At applicant's request, Thomas L. Hustak, Ph.D., a clinical and forensic psychologist, examined applicant and prepared a report of his findings. Dr. Hustak interviewed applicant for two hours, obtained answers to an extensive background questionnaire, and administered two common diagnostic tests, the Minnesota Multiphasic Personality Inventory–2 ("MMPI–2") and the 16–Personality Factor, to determine applicant's psychological and personality profile. These findings provide us much insight into his behavior.

{¶ 26} Dr. Hustak diagnosed applicant with depressive disorder not otherwise specified and as having compulsive, passive/aggressive, and schizoid personality traits. He reported that applicant suffers generally from depression and anxiety and tends to brood and become agitated as a result of emotional difficulties and chronic stress factors. Mainly, however, Dr. Hustak observed that applicant is unable to think efficiently as a result of "cognitive confusion."

{¶ 27} Dr. Hustak described his impressions that applicant has "a lot of interfering thoughts" that "flowed around in his head" and that these are related to "depression, anxiety, and obsessive thinking." He explained that applicant is "perfectionistic" and "overly concerned about doing right," to the extent that he "obsesses and ruminates about his feelings, sometimes thinks that what he has done is wrong, and may even tend to be cynical, suspicious of others, and engaging in his own fantasy thinking." By the schizoid component of his diagnosis, Dr. Hustak referred to applicant's detachment from his emotions and feelings, which, he suspected, caused applicant to overlook the extent of his deficiencies. Dr. Hustak surmised that applicant minimized, if not rejected, the impact of these symptoms on his thinking and behavior.

{¶ 28} Dr. Hustak also described applicant as having a diminished capacity to concentrate and think efficiently and believed that applicant had probably been experiencing these symptoms for some time. As an example, Dr. Hustak cited the fact that applicant had taken over four hours to respond to the MMPI–2 and still left 20 questions unanswered. Dr. Hustak reported that in his experience, most patients complete the MMPI–2 in about one and one-half hours. Applicant, with no real explanation for his slow pace, had to return for a second appointment to finish the test.

{¶ 29} Dr. Hustak concluded that applicant would continue to have difficulty functioning in life, generally encountering problems dealing with people and time constraints, if he failed to address his problems. As for applicant's ability to function as an attorney, Dr. Hustak reviewed the essential eligibility requirements for the practice of law and testified that applicant's faculties to comply with six of ten standards are impaired. According to Dr. Hustak, applicant does not possess, or is otherwise impaired with respect to, the "cognitive capacity to learn, recall what has been learned, to reason and to analyze"; the "ability to communicate clearly with clients"; the "ability to exercise good judgment in conducting one's professional business"; the "ability to conduct himself with a high degree of * * * trustworthiness"; the "ability to conduct oneself diligently and reliably"; or the "ability to comply with deadlines and time constraints." See Supreme Court of Ohio, Definitions of Essential Eligibility Requirements for the Practice of Law, Requirement Nos. 1, 2, 3, 4, 7, and 9, http://www.sconet.state.oh.us/admissions/pdf/ESSENTIAL_ELIGIBILITY_REQUIREMENTS.pdf (Essential Eligibility Requirements).

{¶ 30} Dr. Hustak summarized his findings this way:

{¶ 31} "In my experience as a forensic psychologist, a law practice will require close attention to detail so that [a lawyer's] clients can be ethically and fully represented to the best of [the lawyer's] ability in the specialty area in which one intends to practice. It is difficult to imagine that [applicant] would be efficient in doing this at this time because of the combination of symptoms described above as atypical depression, anxiety, obsessive thinking, and schizoid detachment that seem to be debilitating his ability to concentrate and stay focused on the task at hand."

III. The Character and Fitness Board's Recommendation Is Appropriate

{¶ 32} An applicant for admission to the Ohio bar has the burden to prove by clear and convincing evidence that the applicant possesses the requisite character, fitness, and moral qualifications for admission to the practice of law. Gov.Bar R. I(11)(D)(1). To be approved for admission and to take the bar exam, the applicant must have a record of conduct that justifies the trust of clients, adversaries, courts, and others with respect to the professional duties owed to

them and demonstrates that the applicant satisfies the essential eligibility requirements for the practice of law as defined by the board. Gov.Bar R. I(11)(D)(3). Applicants must establish their capacity to learn, recall, and analyze; to communicate clearly; to exercise good judgment; to act with complete honesty, integrity, and trustworthiness in their professional affairs; to diligently and reliably perform obligations to clients, courts, and others; and to conscientiously comply with deadlines and time constraints. Essential Eligibility Requirements Nos. 1, 2, 3, 4, 7, and 9. Accord *In re Application of Head,* 114 Ohio St.3d 29, 2007-Ohio-2550, 867 N.E.2d 824, ¶ 18.

{¶ 33} Applicant has failed to sustain this burden. In addition to the manifestations of his inability to comply with time constraints generally, he has demonstrated eccentric and irrational thinking that Dr. Hustak attributes to his psychological disorder and abnormal personality traits. Applicant objects to the recommendation for disapproval, but he is unable refute the results of Dr. Hustak's psychological assessment, and he presented no contrary expert opinion. We therefore accept Dr. Hustak's conclusions and agree that the severity of applicant's condition warrants the character and fitness board's recommended disapproval.

{¶ 34} Under Gov.Bar R. I(11)(D)(3)(e), a "mental or psychological disorder that in any way affects or, if untreated, could affect the applicant's ability to practice law in a competent and professional manner" is grounds for disapproving an application for admission to the Ohio bar or to take the Ohio bar exam if it manifests a "significant deficiency in the honesty, trustworthiness, diligence, or reliability" in the applicant. On review, we conclude that applicant is presently psychologically unfit for admission to the practice of law in Ohio. His application for reexamination is therefore disapproved; however, he may apply to take the February 2009 bar examination, providing that (1) he has already undergone treatment with a licensed professional in psychology or psychiatry by that time, (2) he has been reevaluated by Dr. Hustak or another professional approved by the character and fitness board, at his own expense, and (3) he files with his application a copy of that professional's report.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

———————

Rahshann K. Blackwell, pro se.

Porter, Wright, Morris & Arthur, L.L.P., and Kathleen McManus Trafford, special investigator for the Supreme Court Board of Commissioners on Character and Fitness.