[Cite as *Taxiputinbay, L.L.C. v. Put-In-Bay*, 2023-Ohio-1237.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

Taxiputinbay, LLC

    Appellee

v.

Village of Put-In-Bay

    Appellant

Court of Appeals No. OT-22-020

Trial Court No. 2020CVH192

**DECISION AND JUDGMENT**

Decided: April 14, 2023

* * * * *

Andrew R. Mayle and Benjamin G. Padanilam, for appellee.

Susan Keating Anderson, Morris L. Hawk, and Stephen W. Funk,
for appellant.

* * * * *

**CROUSE, V.J.**

{¶ 1} Appellant, the Village of Put-in-Bay ("the Village"), appeals the judgment of the Ottawa County Court of Common Pleas, declaring unconstitutional Section 866.01(a)(4) of the Codified Ordinances of the Village of Put-in-Bay, and permanently enjoining its enforcement. For the reasons that follow, we reverse.

## I. Background

**{¶ 2}** The underlying facts of this case are undisputed.

**{¶ 3}** In March 2020, the Village amended Codified Ordinance 866.01(a)(4), which defines "Taxicab" or "cab" to include

> any vehicle that seeks its business or part thereof on public streets or in
> quasi-public places, and which is operated on the streets of the Village for
> the purpose of transporting members of the general public under
> expectation of compensation or reward in any form. * * * Notwithstanding
> other provisions of this chapter, no vehicle operated as a taxicab shall
> exceed the width of 80 inches, including fender flare but excluding mirrors,
> and shall not exceed the overall length of 25 feet, as determined by the
> Village's inspection conducted under Section 866.14 of this Chapter. * * *

**{¶ 4}** Appellee, Taxiputinbay, LLC ("Taxiputinbay"), owns and operates taxicabs in Put-in-Bay. As a result of the amended ordinance, the Village declined to issue taxicab permits for three of Taxiputinbay's vehicles because they exceeded the 80-inch width limitation.

**{¶ 5}** Taxiputinbay initiated the present matter when it filed a three-count complaint against the Village, seeking (1) declaratory relief that the 80-inch width limitation in Section 866.01(a)(4) violated the Home Rule Amendment in Article XVIII, Section 3 of the Ohio Constitution; (2) declaratory relief that the 80-inch width limitation

2.

violated the Equal Protection Clause in Article I, Section 2 of the Ohio Constitution; and (3) preliminary and permanent injunctions against the enforcement of the 80-inch width limitation.

{¶ 6} The trial court granted a preliminary injunction to Taxiputinbay. Eventually, the parties submitted competing motions for summary judgment. On April 27, 2022, the trial court granted Taxiputinbay's motion for summary judgment, and denied the Village's motion for summary judgment. The trial court declared that the 80-inch width limitation was unconstitutional under both the Home Rule Amendment and the Equal Protection Clause, and thus permanently enjoined the Village from enforcing the provision.

## II. Assignments of Error

{¶ 7} The Village has timely appealed the trial court's April 27, 2022 judgment, and now presents three assignments of error for our review:

1. The trial court erred in declaring that Put-in-Bay's 80-inch width limitation on vehicles that want the privilege of providing for-profit taxicab services on the village's streets violates the Home Rule Amendment, Article XVIII, Section 3 of the Ohio Constitution.

2. The trial court erred in declaring that Put-in-Bay's 80-inch width requirement for taxicab permits violates the Equal Protection Clause, Article I, Section 2 of the Ohio Constitution.

3.

3. The trial court erred in granting a permanent injunction to enjoin the enforcement of the 80-inch width requirement for taxicab permits in Chapter 866 of the Village of Put-in-Bay's codified ordinances.

### III. Analysis

**{¶ 8}** The standard of review for the grant or denial of a motion for summary judgment is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment is appropriate where (1) no genuine issue as to any material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and when viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

**{¶ 9}** Constitutional challenges to local legislation are also reviewed de novo. *Put-in-Bay v. Mathys*, 163 Ohio St.3d 1, 2020-Ohio-4421, 167 N.E.3d 922, ¶ 11. The Ohio Supreme Court has recognized that "[D]uly enacted laws are afforded a strong presumption of constitutionality." *Id.*, citing *Yajnik v. Akron Dept. of Health, Hous. Div.*, 101 Ohio St.3d 106, 2004-Ohio-357, 802 N.E.2d 632, ¶ 16. "To overcome this presumption, the party challenging the law must prove the law unconstitutional beyond a reasonable doubt." *Id.*

4.

## A. Home Rule Amendment

{¶ 10} In its first assignment of error, the Village challenges the trial court's determination that Section 866.01(a)(4) violates the Home Rule Amendment in Article XVIII, Section 3 of the Ohio Constitution, which states, "[M]unicipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Taxiputinbay argued, and the trial court agreed, that Section 866.01(a)(4) is in conflict with R.C. 5577.05(B), which regulates the width of vehicles on Ohio's roadways.

{¶ 11} "A state statute takes precedence over a local ordinance when * * * * (1) the ordinance is an exercise of the police power, rather than of local self-government, (2) the statute is a general law, and (3) the ordinance is in conflict with the statute." *Mendenhall v. Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 17.

{¶ 12} Regarding the first requirement, the Village argues that Section 866.01(a)(4) is an exercise of local self-government, but Taxiputinbay argues that the section is an exercise of the police power. "While local self-government ordinances are protected under [the Home Rule Amendment], police-power ordinances 'must yield in the face of a general state law.'" *Marich v. Bob Bennett Constr. Co.*, 116 Ohio St.3d 553, 2008-Ohio-92, 880 N.E.2d 906, ¶ 11, quoting *Am. Fin. Servs. Assn. v. Cleveland*, 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, ¶ 23. "An ordinance created under

the power of local self-government must relate 'solely to the government and administration of the internal affairs of the municipality.'" *Id.*, quoting *Beachwood v. Bd. of Elections of Cuyahoga Cty.*, 167 Ohio St. 369, 148 N.E.2d 921 (1958), paragraph one of the syllabus. "Conversely, the police power allows municipalities to enact regulations only to protect the public health, safety, or morals, or the general welfare of the public." *Id.*

{¶ 13} We agree with Taxiputinbay that Section 866.01(a)(4) is an exercise of the police power. "'[A]ny municipal ordinance, which prohibits the doing of something without a municipal license to do it, is a police regulation' within the meaning of the Home Rule Amendment." *State ex rel. Morrison v. Beck Energy Corp.*, 143 Ohio St.3d 271, 2015-Ohio-485, 37 N.E.3d 128, ¶ 17, quoting *Auxter v. Toledo*, 173 Ohio St. 444, 446, 183 N.E.2d 920 (1962). In *Morrison*, the Ohio Supreme Court held that the local ordinances were an exercise of the police power because they did not regulate the form and structure of the local government, but instead prohibited—and even criminalized— the act of drilling for oil and gas without a municipal permit. *Id.* at ¶ 18. Here, similarly, Chapter 866 of the Codified Ordinances does not seek to regulate the form and structure of the local government, but instead seeks to regulate and establish a permitting procedure for the operation of taxicabs within the Village in the interest of protecting the

6.

public health, safety, and welfare of the community.[1]  Therefore, we hold that Section 866.01(a)(4) is an exercise of the police power.

{¶ 14} As to the second requirement, the parties do not dispute that R.C. 5577.05 is a general law.  *See Marich* at ¶ 16-29 (analyzing R.C. 5577.05, and concluding that it is a general law).

{¶ 15} The crucial issue in this case relates to the third requirement, which seeks to determine whether Section 866.01(a)(4) is in conflict with R.C. 5577.05(B).  "In determining whether an ordinance is in 'conflict' with general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa."  *Village of Struthers v. Sokol*, 108 Ohio St. 263, 140 N.E. 519 (1923), paragraph two of the syllabus; *Newburgh Hts. v. State*, 168 Ohio St.3d 513, 2022-Ohio-1642, 200 N.E.3d 189, ¶ 29.

{¶ 16} Here, R.C. 5577.05 provides, "(A) no vehicle shall be operated upon the public highways, streets, bridges, and culverts within the state, whose dimensions exceed those specified in this section.  (B) No such vehicle shall have a width in excess of:  (1) One hundred four inches for passenger bus type vehicles operated exclusively within

---

[1] Put-in-Bay Ordinance No. 1240-20—the enacting legislation—recognized, "WHEREAS, this Council finds and determines that due to the public demand for taxi service; traffic congestion and safety of existing vehicular and pedestrian traffic in the Village; the Village population, including the tourist population during the summer months; and public convenience and necessity for taxicab services; the health, safety and welfare of the community will be served by the amendment of Chapter 866 of the Codified Ordinances."

municipal corporations; * * * (5) One hundred two inches, including load, for all other vehicles * * *."

{¶ 17} In comparison, Section 866.01(a)(4) provides, in pertinent part, "Notwithstanding other provisions of this chapter, no vehicle operated as a taxicab shall exceed the width of 80 inches, including fender flare but excluding mirrors, and shall not exceed the overall length of 25 feet."

{¶ 18} Taxiputinbay argues that R.C. 5577.05(B) undisputedly permits the width of its vehicles, but Section 866.01(a)(4) prohibits the vehicles as too wide. Thus, Taxiputinbay concludes that the ordinance and the general law are in conflict. In response, the Village argues that the two are not in conflict because they involve different subject matter. The village contends that the state statute generally controls vehicles that operate on the public roadways, while the ordinance regulates vehicles that are used to provide for-profit taxi services within the Village.

{¶ 19} A plain reading of R.C. 5577.05 and Section 866.01(a)(4) reveal that the two provisions do not directly contradict each other: R.C. 5577.05 states that no vehicle shall exceed 102 (or 104) inches in width; Section 866.01(a)(4) states that no vehicle operated as a taxicab shall exceed 80 inches in width. Importantly, Section 866.01(a)(4) does not prohibit Taxiputinbay from driving its vehicles on the streets of Put-in-Bay; it is only when Taxiputinbay seeks to use its vehicles as taxicabs that the vehicles must be no wider than 80 inches. Thus, for the two provisions to be in conflict, it must be implied

8.

that R.C. 5577.05 grants a right to operate a vehicle greater than 80 inches in width as a taxicab.[2]

{¶ 20} On this issue, we find the Ohio Supreme Court's instruction in *Mendenhall v. Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 31, to be particularly applicable:

Although on occasion a state statute and municipal ordinance will directly contradict each other, and thereby make a conflict analysis simple and direct, that is not always the case. It is in the context of more nuanced cases that the concept of "conflict by implication" has arisen. Rather than an independent test for identifying a conflict, conflict by implication is a

---

[2] In this way, the present case differs from *Marich v. Bob Bennett Constr. Co.*, 116 Ohio St.3d 533, 2008-Ohio-92, 880 N.E.2d 906, which the trial court relied on in finding that a conflict existed in this case. *Marich* concerned a direct, not an implied, conflict. The Ohio Supreme Court held that a direct conflict existed between R.C. 5577.05 and a municipal ordinance. In addition to setting forth a maximum width for vehicles on the roadway, R.C. 5577.05 provided for a permit exception that required drivers (1) to apply for a permit in writing from the relevant jurisdiction, (2) demonstrate good cause to support such a permit, and (3) receive a written permit that authorizes the conduct. *Id.* at ¶ 32. The municipal ordinance in that case, however, provided for an exemption from the permit process on certain, listed roadways within its jurisdiction. *Id.* at ¶ 33. In holding that a conflict existed, the Ohio Supreme Court stated,

> The conflict between these sections is clear. Norton Codified Ordinances 440.01 permits persons to operate excessively wide vehicles on certain roads without engaging in the statutorily mandated permit process and without demonstrating good cause for the exception. While R.C. 5577.05 and 4513.34 prohibit such traffic without a permit, Norton Codified Ordinances 440.01(c)(1) explicitly permits it.

*Id.* at ¶ 34. Here, in contrast, there is no direct conflict between Section 866.01(a)(4) and R.C. 5577.05, but instead the conflict must be implied. Therefore, *Marich* is distinguishable.

9.

subset of the *Struthers* analysis and recognizes that sometimes a municipal ordinance will indirectly prohibit what a state statute permits or vice versa. "When determining whether a conflict by implication exists, we examine whether the General Assembly indicated that the relevant state statute is to control a subject exclusively." *Id.* at ¶ 32. This concept of "conflict by implication" has been long-established in Ohio Supreme Court precedent examining the home rule authority of municipalities. In case after case, the court has examined whether the General Assembly demonstrated its intent to control a subject exclusively to determine whether there is a conflict.

{¶ 21} For example, in *Schneiderman v. Sesanstein*, 121 Ohio St. 80, 86, 167 N.E. 158 (1929), the Ohio Supreme Court held that a municipal ordinance establishing a 15-mile-per-hour speed limit was in conflict with a state statute establishing a 25-mile-per-hour speed limit. In that case, the state statute expressly provided that the speed limit "shall not be diminished, restricted or prohibited by an ordinance, rule or regulation of a municipality or other public authority." *Id.* at 85, quoting section 12608, General Code. Thus, the court recognized that "[i]t was the legislative purpose, clearly manifested by the provisions of sections 12603 and 12608, General Code, to permit vehicles to travel upon the streets and highways of the state at any rate of speed not expressly prohibited by statute." *Id.* at 90. Therefore, the court concluded that "an ordinance of a municipality

10.

which attempts to make unlawful a rate of speed which the state by general law has stamped as lawful would be in conflict therewith." *Id.* at 86.

{¶ 22} In *Neil House Hotel Co. v. Columbus*, 144 Ohio St. 248, 58 N.E.2d 665 (1944), the Ohio Supreme Court held that a municipal ordinance that prohibited the sale of alcohol after midnight conflicted with a state regulation that prohibited the sale of alcohol between 2:30 a.m. and 5:30 a.m. The plaintiff in that case held a valid state liquor permit. *Id.* at 249. Section 6064-15, General Code, provided that one who holds such permits may sell beer and intoxicating liquors after the hour of 1:00 a.m. *Id.* at 252. Pursuant to express authorization granted by Section 6064-3, General Code, the Board of Liquor Control prohibited the sale and consumption of beer and intoxicating liquors between the hours of 2:30 a.m. and 5:30 a.m. *Id.* at 252. At the outset of its analysis, the court noted that the control and regulation of the "liquor traffic" is within the province of the state government, and

> [t]he General Assembly of Ohio has undertaken to control and regulate the production, sale and dispensing of beer, wine and spirituous liquors throughout the state and has created an agency called the Board of Liquor Control to execute and administer the laws and to regulate the conduct of those who engage in the manufacture and sale of alcoholic beverages.

*Id.* at 251. The court held that after examining the state statutes and regulations, "it is difficult to escape the conclusion that plaintiff, under state authorization, may lawfully

sell beer and intoxicants to its customers after the hour of midnight and that a municipal ordinance fixing midnight as the time when the sale of such beverages must cease, is invalid." *Id.* at 252-253.

{¶ 23} In *Lorain v. Tomasic*, 59 Ohio St.2d 1, 391 N.E.2d 726 (1979), the Ohio Supreme Court held that a municipal ordinance that prohibited the paying out of more than $1,200 in prizes during any single bingo session was in conflict with former R.C. 2915.09(B)(5), which prohibited a payout of more than $3,500 during any bingo session. The court recognized that Article XV, Section 6 of the Ohio Constitution grants the General Assembly the power to "authorize and regulate the operation of bingo to be conducted by charitable organizations for charitable purposes." As part of that regulatory scheme "the General Assembly has indicated that once a charitable organization is properly licensed, it has a right, pursuant to R.C. 2915.09(B)(5), to pay out up to, but no more than, $3,500 at any bingo session." *Tomasic* at 3. In reaching its conclusion, the court reasoned,

> To allow ordinances to be enacted throughout the state reducing maximum pay outs in any amount would destroy a uniform application of the newly enacted statutory scheme and create a potential for totally emasculating a duly licensed charitable organization's ability to conduct a lawful bingo operation. Such a construction of R.C. 2915.09(B)(5) would render its language virtually meaningless and nullify its effect.

12.

*Id.* at 5.

{¶ 24} *Am. Fin. Servs.* likewise found that a conflict existed. In that case, a series of state statutes regulated a defined set of "covered loans," which, at a basic level, consisted of mortgages with interest rates ten percentage points higher than the yield on U.S. Treasury securities. *Am. Fin. Servs.*, 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, at ¶ 3. Following the enactment of the state statutes, the city of Cleveland passed a municipal ordinance with stricter limitations aimed at predatory lending. *Id.* at ¶ 14. However, the Ohio Supreme Court recognized that "Through Sub.H.B. No. 386, the General Assembly has expressed its intent to preempt municipal regulation and occupy the field of regulation of predatory lending as an issue of statewide concern." *Id.* at ¶ 31. Because the municipal ordinance applied to a broader swath of loans, and imposed stricter standards and additional requirements on lenders, the court concluded that "Cleveland has undertaken to regulate the making of a loan authorized by the General Assembly. This is directly contradictory to the syllabus in *Struthers v. Sokol* because these ordinances seek to forbid what the statutes allow." *Id.* at ¶ 47-48.

{¶ 25} A few weeks after *Am. Fin. Servs.* was released, the Ohio Supreme Court held that no conflict existed in *Cincinnati v. Baskin*, 112 Ohio St.3d 279, 2006-Ohio-6422, 859 N.E.2d 514. In *Baskin*, a Cincinnati municipal ordinance prohibited the possession of any semiautomatic rifle with a capacity of more than ten rounds. *Id.* at ¶ 1. The state statute at the time prohibited the possession of "any semi-automatic firearm

13.

designed or specifically adapted to fire more than thirty-one cartridges without reloading." *Id.* at ¶ 3. Again, the court examined whether the General Assembly indicated that the relevant state statute is to exclusively control the capacity of semiautomatic weapons. The court held:

> There is nothing in the weapons-control measures in the criminal code that manifests an intent to prevent municipalities from regulating the possession of semiautomatic firearms that hold fewer than 32 rounds. There is no provision in the statute declaring or otherwise suggesting that the limitation upon firing capacity fixed therein is the only limitation controlling the possession of a semiautomatic firearm, that the limitation shall not be diminished or altered by municipal regulation, or that municipalities may not prohibit the possession of lower-capacity firearms than are prohibited by the statute.

*Id.* at ¶ 23.

> {¶ 26} In holding that there was no conflict, the court reasoned,
>
> Cincinnati has not undertaken to regulate or prohibit any conduct that the state has authorized. The relevant state statutes, i.e., R.C. 2923.11 and 2923.17, prohibit the possession of semiautomatic firearms that are designed or adapted to fire more than 31 cartridges without reloading. They do not, however, permit or authorize the possession of semiautomatic

14.

firearms that are capable of firing 31 or fewer cartridges without reloading.

* * *

In the absence of any limiting provision or declaration to the contrary, we conclude that the General Assembly intended to allow municipalities to regulate the possession of lower-capacity semiautomatic firearms in accordance with local conditions, requiring only that under no condition shall municipalities allow the possession of any semiautomatic firearm that is capable of firing more than 31 cartridges without reloading. Thus, the ordinance does not prohibit what the statute permits.

*Id.* at ¶ 23-24.

{¶ 27} Following *Baskin*, the Ohio Supreme Court again held that no conflict existed in *Mendenhall*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255. That case involved a municipality's efforts to establish an "automated mobile speed enforcement system" that imposed a civil penalty for violating the speed limits set by the state. *Id.* at ¶ 4, 6. In holding that the civil penalty regime did not conflict with the state's criminal enforcement of the speed limits, the Ohio Supreme Court reasoned that "although the General Assembly has enacted a detailed statute governing criminal enforcement of speeding regulations, it has not acted in the realm of civil enforcement." *Id.* at ¶ 32. The court concluded, "[B]ecause there is no indication that the state has intended to reserve to

itself the ability to enforce statewide traffic laws through a civil process, we decline to recognize a conflict by implication." *Id.* at ¶ 34.

{¶ 28} Turning to the case at bar, while R.C. 5577.05 is a general law that sets forth the maximum length, width, and height of different classes of vehicles that operate on the public roadways, it does not purport to regulate what type of vehicle may be used to provide for-profit taxicab services. In addition, the Ohio Supreme Court has recognized that there is a fundamental difference between the general right to operate a motor vehicle on the public roadways and the privilege of using a particular vehicle for a regulated purpose. *See Put-in-Bay v. Mathys*, 163 Ohio St.3d 1, 2020-Ohio-4421, 167 N.E.3d 922, ¶ 24 ("Mathys and Islander Inn may drive their golf carts in the village and may even let others use the carts without charging for their use. But if Mathys and Islander Inn want the privilege of renting those vehicles to others for use within the village, they are required to pay the tax imposed by the ordinance on their rental vehicles.").

{¶ 29} Furthermore, unlike *Schneiderman*, *Neil House Hotel*, *Tomasic*, and *Am. Fin. Servs.*, nothing in R.C. 5577.05 indicates the state's intent to exclusively control the width of vehicles used as taxicabs. To the contrary, it has long been recognized that "[w]hile an extensive body of law has been enacted by the Legislature dealing with the operation of motor vehicles over the state highways, the statutes have not occupied the field of the regulation of taxicabs within municipalities." *State ex rel. McBride v.*

*Deckebach*, 117 Ohio St. 227, 232, 157 N.E. 758 (1927).  Indeed, in R.C. 715.22 the legislature has demonstrated its positive intent to allow municipalities to regulate taxicabs by providing that "Any municipal corporation may:  (A) Regulate the use of carts, drays, wagons, hackney coaches, omnibuses, automobiles, and carriages kept for hire or livery stable purposes; [and] (B) License and regulate the use of the streets by persons who use vehicles, or solicit or transact business thereon."

{¶ 30} Thus, we hold that R.C. 5577.05 does not create an implied right to operate as a taxicab any vehicle that is less than 102 (or 104) inches in width, and therefore, Section 866.01(a)(4) does not conflict with R.C. 5577.05.  Consequently, because Section 866.01(a)(4) is an exercise of the local police power that does not conflict with the general law provided in R.C. 5577.05, we hold that Section 866.01(a)(4) does not violate the Home Rule Amendment found in Article XVIII, Section 3 of the Ohio Constitution.

{¶ 31} Accordingly, the Village's first assignment of error is well-taken.

### B. Equal Protection

{¶ 32} In its second assignment of error, the Village argues that the trial court erred when it determined that Section 866.01(a)(4) violated the Equal Protection Clause in Article I, Section 2 of the Ohio Constitution.[3]

---

[3] In its complaint, Taxiputinbay limited its claim to a violation of the Ohio Constitution, and did not assert an equal protection claim under the federal constitution.  Due to the disparate language between the two constitutional provisions, there have been calls for further examination into whether Article I, Section 2 of the Ohio Constitution provides additional or different protection than the Fourteenth Amendment to the United States Constitution.  *See Sherman v. Ohio Pub. Emps. Retirement Sys.*, 163 Ohio St.3d 258,

**{¶ 33}** "The federal and Ohio equal-protection provisions are 'functionally equivalent,' and are to be construed and analyzed identically." (Internal citations omitted.) *Pickaway Cty. Skilled Gaming, L.L.C. v. Cordray*, 127 Ohio St.3d 104, 2010-Ohio-4908, 936 N.E.2d 944, ¶ 17. "Simply stated, the Equal Protection Clauses require that individuals be treated in a manner similar to others in like circumstances." *Burnett v. Motorists Mut. Ins. Co.*, 118 Ohio St.3d 493, 2008-Ohio-2751, 890 N.E.2d 307, ¶ 30, quoting *McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶ 6.

**{¶ 34}** "Courts apply varying levels of scrutiny to equal-protection challenges depending on the rights at issue and the purportedly discriminatory classifications created

---

2020-Ohio-4960, 169 N.E.3d 602, ¶ 38 (Fischer, J., concurring); *Stolz v. J & B Steel Erectors, Inc.*, 155 Ohio St.3d 567, 2018-Ohio-5088, 122 N.E.3d 1228, ¶ 28 (Fischer, J., concurring). However, the Ohio Supreme Court continues to hold that the two equal protection provisions are "functionally equivalent." *See State ex rel. Maras v. LaRose*, Slip Opinion No. 2022-Ohio-3852, ¶ 17 ("We have interpreted the Equal Protection Clause in the Ohio Constitution as being equivalent to the federal Equal Protection Clause."); *State v. Moore*, 154 Ohio St.3d 94, 2018-Ohio-3237, 111 N.E.3d 1146, ¶ 22 ("Most recently we have considered the [Ohio equal protection and federal equal protection] guarantees to be 'functionally equivalent' and employed the same analysis under both provisions."); *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 29 ("[The Ohio and federal] equal-protection provisions are functionally equivalent and require the same analysis."); *but see State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, 74 N.E.3d 368, ¶ 23 ("[W]e make clear that even if we have erred in our understanding of the federal Constitution's Equal Protection Clause, we find that the guarantees of equal protection in the Ohio Constitution independently forbid the disparate treatment [at issue in this case]."). Furthermore, while Taxiputinbay has cited both the Ohio and federal equal protection clauses in its motion for summary judgment and on appeal, Taxiputinbay has not argued that the two provisions require separate consideration.

18.

by the law. '[A] statute that does not implicate a fundamental right or a suspect classification does not violate equal-protection principles if it is rationally related to a legitimate government interest.'" *Pickaway* at ¶ 18, quoting *State v. Williams*, 126 Ohio St.3d 65, 2010-Ohio-2453, 930 N.E.2d 770, ¶ 39. Here the parties do not dispute that this case does not involve a fundamental right or suspect classification, thus rational-basis review applies.

{¶ 35} "The rational-basis test involves a two-step analysis. We must first identify a valid state interest. Second, we must determine whether the method or means by which the state has chosen to advance that interest is rational." *Id.* at ¶ 19, quoting *McCrone* at ¶ 9.

> Under the rational-basis standard, a state has no obligation to produce evidence to sustain the rationality of a statutory classification. Statutes are presumed to be constitutional and * * * courts have a duty to liberally construe statutes in order to save them from constitutional infirmities. The party challenging the constitutionality of a statute bears the burden to negate every conceivable basis that might support the legislation.

(Internal citations omitted.) *Id.* at ¶ 20.

{¶ 36} As to the first step, in her affidavit, the mayor of the Village stated that the 80-inch width limitation served several public safety purposes intended to protect both the Village's residents as well as tourists. "Legislative concern for public safety is not

only a proper police power objective—it is a mandate." *Arnold v. Cleveland*, 67 Ohio St.3d 35, 47, 616 N.E.2d 163 (1993). Thus, the Village has identified a valid state interest in protecting the safety of its residents and visitors.

{¶ 37} As to the second step, "Ohio courts grant substantial deference to the legislature when conducting an equal-protection rational-basis review." *Pickaway* at ¶ 32, quoting *Williams* at ¶ 40. "A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* "Furthermore, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because 'it is not made with mathematical nicety or because in practice it results in some inequality." *Id.*, quoting *Am. Assn. of Univ. Professors, Cent. State Univ. Chapter v. Cent. State Univ.*, 87 Ohio St.3d 55, 58, 717 N.E.2d 286 (1999).

{¶ 38} Here, as stated in the mayor's affidavit, limiting the width of taxicabs is rationally related to the goal of protecting public safety by reducing the threat to pedestrians and those on golf-carts, by reducing congestion on crowded, narrow streets, and by providing more room for the Village's emergency response vehicles to navigate the streets.

{¶ 39} In response, Taxiputinbay argues that the 80-inch width limitation is irrational (1) because it only applies to taxicabs and not to other, larger vehicles, such as

20.

delivery trucks, (2) because the number of vehicles it applies to is small given that there are only 36 taxicab licenses, and (3) because existing laws and ordinances already protect the public safety, such as R.C. 5577.05(B) (governing the width of vehicles), Section 452.09 (time limits for "unloading zones"), Section 452.10 (establishing rules for "taxicab stands"), Section 452.11 (outlawing stopping in alleys or narrow streets without leaving at least 10 feet of room), and Section 452.111 (banning parking on certain roads in the Village).

{¶ 40} However, "[a] legislative body may direct its legislation against any evil as it actually exists, without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are not forbidden." *Pickaway* at ¶ 41, quoting *Benjamin v. Columbus*, 167 Ohio St. 103, 117, 146 N.E.2d 854 (1957). "The task of classifying persons for * * * benefits * * * inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial consideration." *Id.*, quoting *Fitzgerald v. Racing Assn. of Cent. Iowa*, 539 U.S. 103, 108, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003).

{¶ 41} Here, it is reasonable to conclude that taxicabs would be most often used during the busiest times of the day. Thus, taxicabs pose a different danger than, for example, delivery trucks, which may deliver or operate during non-peak hours. Taxicabs

21.

also operate closer to the public, and deliver passengers to store fronts instead of back alleys, thereby posing a greater risk to pedestrians. As such, it is not irrational to limit the width of taxicabs to protect the safety of residents and tourists.

{¶ 42} Therefore, we hold that Section 866.01(a)(4) does not violate the Equal Protection Clause because it is rationally related to a valid state interest in protecting the safety of residents and tourists.

{¶ 43} Accordingly, the Village's second assignment of error is well-taken.

### C. Permanent Injunction

{¶ 44} Finally, in its third assignment of error, the Village argues that the trial court erred when it granted a permanent injunction against the enforcement of Section 866.01(a)(4).

{¶ 45} "The test for the granting or denial of a permanent injunction is substantially the same as that for a preliminary injunction. However, in the case of a permanent injunction, the plaintiff must prove that he *has* prevailed on the merits, not merely that there is a 'substantial likelihood' of prevailing on the merits." (Emphasis sic.) *Gimex Properties Corp., Inc. v. Reed*, 6th Dist. Lucas No. L-22-1049, 2022-Ohio-4771, ---N.E.3d---, ¶ 62; *W. Branch Local Sch. Dist. Bd. of Edn. v. W. Branch Edn. Assn.*, 2015-Ohio-2753, 35 N.E.3d 551, ¶ 15 (7th Dist.) ("A permanent injunction test requires a higher standard. It requires the party seeking it to demonstrate a right to relief under the applicable substantive law. Or in other words, the moving party must prove that he has

prevailed on the merits.").  Here, as discussed above, Taxiputinbay has not prevailed on the merits in that Section 866.01(a)(4) is not unconstitutional.  Therefore, we hold that the trial court erred in granting a permanent injunction.

{¶ 46} Accordingly, the Village's third assignment of error is well-taken.

## IV. Conclusion

{¶ 47} For the foregoing reasons, the judgment of the Ottawa County Court of Common Pleas is reversed, and summary judgment is entered in favor of the Village on Taxiputinbay's claims.  Taxiputinbay is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.                          _____
                                                                JUDGE
Candace C. Crouse, V.J.

Pierre H. Bergeron, V.J.                   _____
CONCUR.                                                 JUDGE

                                                _____
                                                                JUDGE


Judges Candace C. Crouse and Pierre H. Bergeron, First District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.

23.

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.